**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| DAVID PULPHUS, | ) | |
| 4015 North 23rd Street, | ) | |
| St. Louis, MO 63107; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| REPRESENTATIVE WILLIAM LACY | ) | |
| CLAY, | ) | |
| United States House of | ) | |
| Representatives, | ) | |
| Washington, DC 20515; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 17-0310 (JDB) |
| v. | ) | |
| | ) | |
| STEPHEN T. AYERS, in his | ) | |
| official capacity | ) | |
| as Architect of the Capitol, | ) | |
| c/o General Counsel | ) | |
| 2nd & D Streets SW, | ) | |
| Room H2-265A | ) | |
| Washington, DC 20515; | ) | |
| | ) | |
| Defendant. | ) | |

_____

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

Plaintiffs filed this action under the First Amendment alleging that their rights were

violated when a painting, created by Plaintiff David Pulphus and selected and sponsored by

Plaintiff Representative William Lacy Clay, was removed from a wall in the Cannon Tunnel

which connects the Capitol Building to House Office Buildings.  Plaintiffs allege that the

Pulphus painting was selected in the course of a Congressional Art Competition and that its

removal by Defendant Stephen T. Ayers, the Architect of the Capitol, was in violation of their First Amendment Free Speech rights.

Plaintiffs' motion for a preliminary injunction should be denied. They have failed to meet their heavy burden of establishing an entitlement to preliminary injunctive relief. First, plaintiffs are unlikely to succeed on the merits of their claims. Plaintiffs have failed to name the appropriate defendant and thus lack standing to challenge the actions at issue in this lawsuit. However, even assuming that plaintiffs have standing, plaintiffs are incorrect in suggesting that the speech at issue is anything other than government speech. The government has designated a wall within the tunnels of the House Office Building as a location for an art display selectively chosen by the government through the procedural mechanism of a competition the government designed, sponsored, and controls. This Circuit has held that the mere fact that a private party creates the art chosen by the government does not render the display of that art private speech. And the fact that the art is chosen through a competition that involves private party participation does not deprive the art program, and its display on the tunnel wall, of its government speech character, and open up the tunnel wall to public discourse subject to the First Amendment, any more than the National Gallery of Art's selection and display of pieces of art on loan from private parties would turn a wall in the National Gallery of Art into some kind of forum for First Amendment activity. Indeed, were it otherwise, the government would be hamstrung in its ability to conduct events such as the Congressional Art Competition lest it cede the ability to decide what is appropriate for viewing on the walls of its own building.

Plaintiffs have also failed to show that they will suffer any irreparable injury if an injunction is denied. Although the loss of First Amendment Free Speech rights is recognized to constitute irreparable injury, plaintiffs have no First Amendment Free Speech rights at stake in

this controversy.  Given that plaintiffs identify no other source of irreparable injury, they plainly have failed to meet this prong of the test for the entry of a preliminary injunction.

By contrast, the entry of a preliminary injunction would cause concrete harm to the government and the public interest.  The government clearly has an interest in deciding what kind of art will be displayed on the walls of its buildings and in maintaining the dignity and appearance of the Capitol Buildings.  The government must be able to exercise editorial discretion in making such selections without losing control over its art display merely because the selection process involved a competition with the participation of private parties.  It is not in the public interest to impinge on the government acting as a patron of the arts in a way that would make the government reluctant to expend efforts in this endeavor.

Consequently, this Court should deny plaintiffs' motion for a preliminary injunction.

## FACTUAL BACKRGOUND

### A.      U.S. Capitol Building Art Display

In 1982 and every year since, Congress has displayed artwork in the tunnels connecting the Capitol Building to House Office Buildings.  In order to select the pieces of art to hang on these walls, Congress created and implemented the Congressional Art Competition ("Competition"), which provides an "opportunity for Members of Congress to encourage and recognize the artistic talents of their young constituents."  See Declaration of Stephen T. Ayers ("Ayers Decl.'), Architect of the Capitol, at ¶ 6, Ex. 2.  Congress proudly displays the Competition's artwork selected to "serv[e] as a welcome to all those who come to Washington, DC, and visit the Capitol."  H. R. 1453, 111th Cong. (2010).

Congress' original vision for the Competition was "a program for encouraging nationwide artistic creativity by high school students through art exhibits in the tunnels connecting the Capitol to the House Office Buildings."  Ayers Decl. at ¶ 6, Ex. 2.  Each year, the

artwork of one student per participating congressional district is selected to represent the district, and if sponsored by the House Member representing that district, the winning artwork is displayed in the tunnel connecting the Cannon House Office Building ("Cannon Tunnel") to the U.S. Capitol Building.  Id.  Open only to high school students, more than 650,000 students nationwide have been involved in the program since its inception.  Id.

The Competition is subject to certain guidelines, in accordance with the original authorization from Speaker Thomas P. O'Neill, Jr., who specified that the Competition must be administered so as "to assure that the dignity and appearance of the Capitol Buildings are maintained."  Id. at ¶ 7.  The Competition's rules and guidelines are promulgated by the House Office Building Commission, which consists of the Speaker and two Members appointed by the Speaker.  See id. at ¶ 11; see generally 2 U.S.C. § 2001 (House office buildings are "under the control and supervision of the Architect of the Capitol, subject to the approval and direction of" the House Office Building Commission, and the Commission prescribes "rules and regulations to govern said architect" regarding the use of House buildings).  Specifically, under the Competition's published Suitability Guidelines:

> [T]he final decision regarding the suitability of all artwork for the 2016 Congressional Art Competition exhibition in the Capitol will be made by a panel of qualified persons chaired by the Architect of the Capitol.  While it is not the intent to censor any artwork, we do wish to avoid artwork that is potentially inappropriate for display in this highly travelled area leading to the Capitol. Artwork must adhere to the policy of the House Office Building Commission.  In accordance with this policy, *exhibits depicting subjects of contemporary political controversy or a sensationalistic or gruesome nature are not allowed*.  It is necessary that all artwork be reviewed by the panel chaired by the Architect of the Capitol and any portion not in consonance with the Commission's policy will be omitted from the exhibit.

Ayers Decl. at ¶ 11, Ex. 5 (emphasis added).

4

The same Suitability Guidelines are included in the 2016 Rules and Regulations for students and teachers participating in the Competition.  Id. at ¶ 11, Ex. 6.  Each student submitting a piece of artwork for consideration must sign an acknowledgement that "the final decision regarding the suitability of an art entry to be displayed in the Capitol will be made by a House panel chaired by the Architect of the Capitol."  Id. at ¶ 12, Ex. 7.  In addition, each Member must certify that, with respect to the winning artwork, the Member has "approve[d] of its content" and will be "responsible for [the artwork's] content."  Id.

**B.     The Architect's Practices and Handling of Controversies**

The Competition's rules provide that the Architect, as chair of a reviewing panel, must give final approval for all exhibits.  Id. at ¶ 11, Ex. 5.  In practice, however, the Architect generally relies on the certifying Member to ensure that the winning artwork satisfies all applicable requirements, including the Suitability Guidelines.  Id. at ¶ 16.  Further, the Architect usually relies on his or her staff, including the Architect's Curator, to review the submissions.  Id. at ¶¶ 13-14.  After all the works have been selected and approved by their respective Members and collectively placed in a room for hanging, the Architect's staff reviews each exhibit to ensure it meets the Competition's size and sturdiness requirements.  Id. at ¶ 14.  During this review, the Architect's staff sometimes identifies exhibits whose contents may be questionable under the Suitability Guidelines.  Id. at 15.

As the Competition's guidelines make clear, it is not the intention of the Architect to censor artwork.  See id. at ¶ 11, Ex. 5.  In keeping with this intention, if the Architect's staff discover any questionable content, they usually contact the sponsoring Members' office to confirm whether the Member wishes to submit an alternate submission or if he or she continues to support of the original artwork.  Id. at 15; see Declaration of Michele Cohen ('Cohen Decl."),

Supervisory Museum Curator for the Architect of the Capitol, at ¶ 9.  This informal practice is

consistent with the Architect's reliance on each Member to ensure that the art sponsored by the

Member meets the Suitability Guidelines.  See Declaration of Barbara Wolanin ("Wolanin

Decl."), former Curator for the Architect of the Capitol, at ¶ 5; Cohen Decl. at ¶¶ 9-10.

On at least one occasion, the Architect staff's preliminary concerns regarding an exhibit's

content resulted in an alternate submission from a Member.  In a prior-year Competition, a

Member's submission included a photograph of a human birth.  See Wolanin Decl. at ¶ 8.

Although the photograph demonstrated artistic merit, the Architect's staff raised concerns that

the submission was too graphic for public display.  Id.  The sponsoring Member's office agreed,

and the student submitted an alternate artwork for display.  Id.; see also Ayers Decl. at ¶ 16

(noting an instance where the Architect retroactively removed an exhibit due to copyright

issues).

### C.    The Selection and Approval of "Untitled #1"

In May of 2016, Representative Clay, after convening a panel of local artists, adopted the

panel's unanimous recommendation and selected Pulphus's "Untitled #1" to represent Missouri's

First Congressional District in the Cannon Tunnel.  See Clay Decl. at ¶¶ 5, 7.  According to

plaintiffs, "Untitled #1" depicts a protest where:

> In the foreground of the Painting, two police officers and a young man face each
> other in a standoff.  The officers have guns drawn and pointed at the young man.
> Both the young man and the officers have animalistic features: the officers appear
> to have the heads of warthogs, while the young man has the head of a wolf and a
> long tail.  In the background, protesters look on, and another officer arrests
> another young man; none of these figures have animalistic features.  A young
> black man, crucified on the scales of justice, hovers just above the fray.

See Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction

("Plaintiffs' Mem.") at 6 (citations omitted).

For the 2016 Competition, the Architect convened a review panel including the following individuals: Michele Cohen, Architect of the Capitol Curator; Jennifer Blancato, Architect of the Capitol Museum Curator; and Carol Beebe, Exhibits and Education Director, Capitol Visitors Center.  See Cohen Decl. at ¶ 3.  On June 2, 2016, the panel conducted an inventory of the room where all of the 2016 Competition submissions were initially assembled.  Id. at ¶ 5.  As a threshold matter, the panel set aside any oversized artwork that appeared to exceed the Competition's sizing criteria.  Id.  The panel identified approximately 25 oversized exhibits, including "Untitled #1," which the panel flagged for improper and oversized framing.  Id. at ¶ 5, Ex. 1.  At that time, the panel did not review the content of "Untitled #1" for suitability.  Id. at ¶ 7.  Consistent with its practice regarding oversized exhibits, staff from the Competition's co-chairs took possession of the painting and contacted Representative Clay's office to request they collect it and make the necessary adjustments.  Id. at ¶ 8.

The Architect's staff did not see "Untitled #1" again until the last day of scheduled hanging, when Representative Clay's staff returned it directly to the Cannon Tunnel for the Architect's staff to hang.  Id. at ¶ 13.  The frame had been removed to conform to the size requirement and the Architect's staff determined that "Untitled #1" appeared to be an appropriate size for hanging.  Id.  At that time, however, the Architect's staff did not make any last-minute assessment of the artwork's content with respect to suitability.  Id.  Rather, the Architect's staff simply hung "Untitled #1" in a space specifically designated for Missouri's First Congressional District in the Cannon Tunnel, where it stayed until January 15, 2017.  See Ayers Decl. at ¶ 23.

### D.      Removal of "Untitled #1"

The controversy surrounding "Untitled #1" began near the end of December 2016.  After receiving public criticism from Representative Dave Reichert and others, the painting attracted

negative media attention as well as criticism from several other Members of Congress.  This controversy included the unilateral removal of the painting by Representative Duncan Hunter, as well as removals by other Members on two other occasions.  After each removal, Representative Clay rehung the painting.  See id. at ¶¶ 18-19.

On January 11, 2017, Representative Reichert requested the Architect to review "Untitled #1" against the Competition's Suitability Guidelines.  Id. at ¶ 20, Ex. 10.  Recognizing his responsibility under the Competition's Rules and Regulations, the Architect informally conferred with the Architect of the Capitol Curator, Dr. Cohen, and outside industry experts regarding whether "Untitled #1" met the Suitability Guidelines.  Id. at ¶ 22.  The industry experts included Dr. Richard Kurin, the Smithsonian's Acting Provost and Under Secretary for Museums and Research, and Dr. Anne-Imelda Radice, the Director of the American Folk Art Museum in Manhattan.  Id.  The Architect and these experts came to the consensus that "Untitled #1" did not meet the Competition's Suitability Guidelines.  Id.  On that basis, the Architect authorized the removal of the painting and sent a letter to Representative Clay confirming the Architect's determination that the painting did not comply with the Competition's Suitability Guidelines and, as a result, violated the House Office Building Commission's policy.  Id. at ¶¶ 23-24.  The Architect received no complaints from other Members regarding any other submissions featured in the Competition.  Id. at ¶ 26.

Following the Architect's removal of "Untitled #1" from the Cannon Tunnel, Representative Clay sought to have the Architect's decision reversed by the House Office Building Commission, which consists of House Speaker Paul Ryan, Majority Leader Kevin McCarthy, and Democratic Leader Nancy Pelosi.  Id. at ¶¶ 4, 28.  The House Office Building Commission, which serves in a supervisory role to the Architect, voted to uphold the Architect's decision regarding "Untitled #1."  Id. at ¶ 28; see 2 U.S.C. § 2001 (providing that the Architect's authority is "subject to

the approval and direction" of the House Office Building Commission).  This lawsuit, and plaintiffs'

subsequent request for preliminary injunctive relief, followed.

## LEGAL STANDARDS FOR A PRELIMINARY INJUNCTION

It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it

has a substantial burden of proof.  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20, 24 (2008).

As this Court recently noted in AARP v. U.S. Equal Employment Opportunity Comm., Civil No.

16-2113, 2016 WL 7646358 (D.D.C. Dec. 29, 2016) (JDB), "[a] preliminary injunction is 'an

extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a

clear showing, carries the burden of persuasion.'  Mazurek v. Armstrong, 520 U.S. 968, 972

(1977) (per curiam) (internal quotation marks and emphasis omitted)."  AARP, 2016 WL

7646358 at * 8.   To be entitled to the extraordinary remedy of emergency injunctive relief, a

plaintiff must meet this strict burden by showing that: (1) there is a substantial likelihood of

prevailing on the merits of his or her claims; (2) a preliminary injunction is necessary to prevent

him or her from suffering irreparable harm; (3) the threatened injury to the plaintiff outweighs

the possible harm to others; and (4) the public interest favors the issuance of the injunction.

Winter, 555 U.S. at 20; see, e.g., Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); Mills

v. District of Columbia, 571 F.3d 1304, 1308 (D.C. Cir. 2009).  As the Court of Appeals for this

Circuit held in Abdullah v. Obama, 753 F.3d 193 (D.C. Cir. 2014), "'[w]hen seeking a

preliminary injunction, the movant has the burden to show that all four factors, taken together,

weigh in favor of the injunction.'"  Id. at 197, quoting Davis v. Pension Benefit Guaranty Corp.,

571 F.3d 1288, 1292 (D.C. Cir. 2009).

Until the Supreme Court's decision in Winter in 2008, the four factors for a preliminary

injunction were analyzed on a sliding scale, such that relief could be granted if there was a strong

showing on one factor and a lesser showing on one of the other factors.  Davis, 571 F.3d at 1291.

In <u>Winter</u>, however, the Supreme Court appeared to reject the notion that a strong showing on one factor could allow the plaintiff to make a lesser showing on another factor.  <u>Winter</u>, 555 U.S. at 21.  The Court of Appeals for this Circuit has yet to decide whether the sliding scale analysis survives the decision in <u>Winter</u>.  <u>See</u> Aamer v. <u>Obama</u>, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (noting that "it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement'") (citations omitted).

This Court, however, need not resolve this question because plaintiffs' claims here fail under any standard for a preliminary injunction.  This is especially true because plaintiffs' claim of irreparable injury is wholly dependent upon their achieving success on the merits of their claim that their First Amendment rights have been violated.  Since plaintiffs have no chance of success on the merits of their claim that their First Amendment rights have been violated, they similarly have no chance of demonstrating any irreparable injury.

## ARGUMENT

### I.      Plaintiffs Have Failed to Demonstrate that They are Likely to Succeed on the Merits of this Case.

As a threshold matter, plaintiffs lack standing to bring their claims.  Representative Clay may not sue for injury allegedly occurring to him while acting in his official capacity, and both plaintiffs have failed to sue the proper party defendant currently responsible for their alleged injuries.

But even if plaintiffs had standing to pursue their claims, their entire argument rests upon the faulty premise that by establishing a Congressional Art Competition as a means by which the government chooses art to display on government walls on a tunnel between the Capitol and the House Office Building, the government has somehow opened up these interior walls to public discourse protected by the First Amendment.   On the contrary, the art display on government

walls on a tunnel between the Capitol and the House Office Building constitutes government speech.  The fact that this display was created through a Congressional Art Competition involving private parties – a competition which the government designed, sponsored, and controlled – does not alter this conclusion.  Since the First Amendment's Free Speech Clause applies to government regulation of private speech, not to government speech, plaintiffs' claims are not likely to succeed on the merits and, indeed, must fail as a matter of law.

### A.      Plaintiffs Lack Standing to Pursue Their Claims.

Plaintiff Representative Clay has sued claiming the action that he took in his official capacity as a Member of the House of Representatives has been overturned by the Architect. The injury claimed by Representative Clay is not claimed in any private capacity but rather solely in his institutional capacity as a Member.  Because the claimed injury flows from Representative Clay's official actions taken on behalf of his constituents, as opposed to any personal actions, he lacks standing to pursue his claims.  Raines v. Byrd, 521 U.S. 811, 820 (1997).

Additionally, both plaintiffs lack standing because they have sued the wrong party. Although the Architect of the Capitol removed the Pulphus art from the Cannon Tunnel wall, his decision was subject to an appeal taken to the House Office Building Commission, which upheld his decision.  See Ayers Decl. at ¶ 25.  Thus, plaintiffs' current injuries stem from action taken by the House Office Building Commission which, under Fed. R. Civ. P. 19(a), should be a party to this action but is not.  Given that plaintiffs' current injuries can no longer be traced to the action taken by the Architect, because that action was overtaken by the decision by the House Office Building Commission, they lack standing to bring their claims against the Architect.  See, e.g., Spencer v. Kemna, 523 U.S. 1, 7 (1998) (present injury must be traceable to defendant);

Lujan v. Defs. Of Wildlife, 504 U.S. 555, 562 (1992) (no standing if decision made by

independent actor not before the court).

> **B.      The Art Display in the Cannon Tunnel
> Constitutes Government Speech.**

> **1.  The Factors Establishing Government Speech**

In order for this Court to assess whether the First Amendment's Free Speech Clause

applies to plaintiffs' claims, the analysis must begin with identifying the type of speech at issue.

Although the regulation of private speech is subject to varying levels of First Amendment

protection, depending upon the forum in which the speech occurs, the Supreme Court has made

clear, repeatedly, that the government is entitled to use government property to engage in

government speech, as long as such use is within reason.  The First Amendment's Free Speech

Clause does not apply to government speech.

In Walker v. Texas Div., Sons of Confederate Veterans Inc., 135 S. Ct. 2239 (2015), the

Supreme Court considered a First Amendment challenge to the state's rejection of a request for a

specialty car license plate featuring a Confederate battle flag.  The Court began by emphasizing

that the government is entitled to engage in its own speech.  Id. at 2246.  In order to determine

whether the speech at issue constituted government speech, the Court looked to three different

factors: (1) whether the forum is one which the government traditionally uses to speak to the

public; (2) whether a reasonable person observing the speech would interpret it as conveying a

message on behalf of the government; and (3) whether the government maintained control over

the speech conveyed.  Walker; 135 S. Ct. at 2247.

The Court concluded that the history of license plates has traditionally communicated

messages from the states, because they contain the name of the state, a state issued vehicle

identification number, and a slogan selected by the state to "urge action, to promote tourism, and

to tout local industries." Id. at 2248.  The Court next found that license plates are closely

associated in the public's mind with the government, because they are required by the

government for vehicle registration and identification; they bear the name of the state; the state

dictates the type of designs placed on the license plates; and the state dictates how a driver may

dispose of the plate when no longer used.   Id.  Therefore, any individual looking at a license

plate would interpret any language or design on the plate as conveying a message endorsed by

the state.  Id. at 2249.  Finally, the Court held that the state maintains direct control over

everything placed on a license plate.  Id.  Taking these three considerations together, the Court

easily concluded that license plates convey government speech.  Id. at 2249.

The Court's decision in Walker was based in large part on its prior decision in Pleasant

Grove City v. Summum, 555 U.S. 460 (2009), in which a religious organization sought

permission to erect a permanent monument with religious messages in a public park that already

contained other permanent monuments, including a Ten Commandments monument that had

been donated by a private organization.  Id., 555 U.S. at 464-65.  The city had selectively chosen

the permanent monuments it wished to display in the park.  Id. at 473.  The Supreme Court made

clear that it has repeatedly held that the government has the right to engage in its own speech.

Id. at 467, citing, e.g., Johanns v. Livestock Marketing Ass'n, 544 U.S. 550, 553 (2005);

Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 139, n.7

(1973) (Stewart, J., concurring); Board of Regents of Univ. of Wis. System v. Southworth, 529

U.S. 217, 229 (2000).

With respect to the three considerations applied in Walker, the Court in Summum

concluded that "[p]ermanent monuments displayed on public property typically represent

government speech" because "[g]overnments have long used monuments to speak to the public."

Id.  Additionally, the Court found that members of the public associate public parks with the government.  555 U.S. at 470, 472.   Finally, the Court noted that the city controlled the messages conveyed by the monuments because it had final approval over which monuments were selected to be placed in the park.  Id. at 472-73.

### 2.  The Art Display at Issue Meets the Walker/Summum Tests for Government Speech

The facts at issue here plainly meet the Walker/Summum test for government speech. First, Congress traditionally speaks to the public through the monumental buildings and grounds of the Capitol campus.  The Capitol campus is where Members of Congress send their message to the public by enacting laws that govern public behavior.  Art and statues that permeate the Capitol campus are selectively chosen to convey a government message concerning this country's history.  Here, there is no dispute that Congress chose certain art it selected through the Competition to hang on the walls in the Cannon Tunnel to advance a message of government support for young artists.

Plaintiffs argue, however, that the Competition does not involve any intent by the government to convey a message because there is "no theme[.]"  Plaintiffs' Mem. at 29. Plaintiffs are wrong.  Here, the indicia of government speech permeate the facts in this case.

The art selected through the Competition hangs on a wall in the Cannon Tunnel connecting government buildings.  The Congressional Art Competition, as its name denotes, is a competition created by Congress and overseen by Members of Congress, to convey a government message of support to young artists.  Indeed, plaintiffs concede that the purpose of this Competition, since its inception, is for Congress to be a patron of the arts and the only reason the art in question was hung on the Cannon Tunnel wall was because Congress decided that it wanted to "encourage[e] nationwide artistic creativity by high-school students through art

14

exhibits in the tunnels connecting the Capitol to the House Office Buildings.'"  Plaintiffs' Mem.

at 2, *quoting* Declaration of Kymberly K. Evanson, Ex. A-2.   In selecting the artwork to be

hung, Congress decides how it desires to encourage such creative endeavors consistent with the

appropriate level of decorum for the institution.  See Summum, 129 S. Ct. at 1133 ("When a

government entity arranges for the construction of a monument, it does so because it wishes to

convey some thought or instill some feeling in those who see the structure.").

Plaintiffs also argue that the Competition has no budget or staff nor is it authorized by

legislation.  Plaintiffs' Mem. at 29.  Plaintiffs, however, cite no authority for the proposition that

the lack of these factors deprives the art display of its government speech character.  Id.

Moreover, plaintiffs are wrong.  Although the Competition does not have its own separate staff,

there are government personnel who create, monitor and control the Competition.  As discussed

above the Competition's rules and guidelines are promulgated by the House Office Building

Commission.   The Architect's Curator and staff reviews the submissions.  Members of

Congress, in their official capacities, run the Competition in their respective districts and must

sponsor the winning art piece selected.  The Architect's staff reviews the art to ensure that it

meets the Competition's size and sturdiness requirements.  The House Office Building

Commission resolves any disputes among the Members about the art to be displayed.  See, supra

at 5, 8-9. All of this contributes toward Congress speaking to members of the public through the

art display it chooses.

Second, members of the public seeing the art display would reasonably assume that it is

endorsed by the government.  The art display is on the walls of a government building.  Just like

the monuments in the public park in Summum, members of the public would reasonably assume

that Congress is conveying a message by its choice of art to hang on the walls of the Cannon

Tunnel.  See Summum, 129 S. Ct. at 1133.  The rules for the Competition publicly broadcast the

fact that the winning art selection must be endorsed by a Member of Congress and is subject to

Congressional guidelines in the process.  Ayers Decl. at ¶ 12.  Indeed, the very title of the exhibit

– the Congressional Art Competition – conveys the fact that the display was selected and approved

by Congress itself.

Third, there is no dispute that the government maintains control over the Competition and

art display.  The Architect's staff oversees the competition and Members of Congress must

sponsor any piece of art chosen to be hung in the Cannon Tunnel.  Once the art is hung, it is

under the complete control of Congress; student submitters may not demand the return of their

artwork prior to the end of the exhibition.  If there is a question about the size and frame for the

art, or whether it meets the Suitability Guidelines, that is decided by the Members, the Architect,

or the House Office Building Commission.  Ayers Decl., ¶¶ 15-16.  And ultimate final approval

is exercised by House Office Building Commission.  2 U.S.C. §  2001.  Through all these

procedures, the government keeps significant control over the art it chooses to display in the

Cannon Tunnel.  See Walker, 135 S. Ct. at 2249 (Texas effectively controlled all the messages

on license plates by exercising final approval over their selection).

Thus, the facts presented here easily meet the test set out in Walker/Summum for a finding

of government speech.

### 3.  Government Speech that Includes Submissions from Private Parties Remains Government Speech

Plaintiffs make much of the actions taken by private parties in connection with this art

display.  But in both Walker and Summum, the Supreme Court made clear that the mere fact that

the government speech is aided by actions taken by a private entity does not necessarily destroy

the government character of the speech.

In Summum, the permanent monuments that the city accepted for installation in its park were often privately funded or donated.  Nonetheless, the Court clearly held that "[a] government entity may exercise the same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." Id., 555 U.S. at 468.  See Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 833 (1995).  Indeed, "[j]ust as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land." Summum, 555 U.S. at 470-471.

Similarly in Walker, the fact that a license plate message may be suggested by a private party did not alter the government nature of the message. Id., 135 S. Ct. at 2251.  As the Supreme Court stated, "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the government nature of the message or transform the government's role into that of a mere forum-provider." Id.

These principles are plainly applicable to the government's choice of art to be placed on government property.  The fact that the art chosen was created by a private party in no way alters the applicability of the government speech doctrine.  The government still exercised its discretion to choose the pieces of art to display on the walls of the Cannon Tunnel, and the exercise of editorial discretion in selecting and presenting third-party speech is itself a speech activity. Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 674 (1998).

Indeed, the Court of Appeals for this Circuit addressed this very issue in People for the Ethical Treatment of Animals v. Gittens, 414 F.3d 23 (D.C. Cir. 2005) (PETA).  In that case, the Court of Appeals considered whether the District of Columbia's Commission on Arts and Humanities' program to showcase local artists "'with creative, humorous art,'" called the "Party

17

Animals Program," to be displayed on city spaces implicated the First Amendment rights of

PETA, a private organization, whose proposed display was rejected by the Commission.  The

Commission invited artists to submit sculptures of donkeys and elephants for display at various

public locations around the city.  Id. at 25. The District Court had concluded that the rejection of

PETA's display constituted impermissible viewpoint discrimination in violation of the First

Amendment, because the Commission had acted inconsistently in its treatment of art pieces

accepted.  People for the Ethical Treatment of Animals v. Gittens, 215 F. Supp.2d 120, 131-134

(D.D.C. 2002).

     The Court of Appeals reversed.  The Court of Appeals concluded that the District's

Commission was engaged in government speech:

> [w]hen it determined which elephant and which donkey models to include in the
> exhibition and which not to include.  In using its 'editorial discretion in the
> selection and presentation of' the elephants and donkeys, the Commission thus
> 'engage[d] in speech activity'; 'compilation of the speech of third parties' is a
> communicative act.

PETA, 414 F.3d at 28 (citation omitted).

     The Court observed that "[t]he First Amendment's Free Speech Clause does not

limit the government as speaker" and thus the government may make choices in which

speech it wishes to advance, including making decisions based upon the viewpoint of the

speech.  Id.  Thus, the Court noted, a museum may choose which art pieces it wishes to

display, even if the choices present a one-sided view of a particular subject.  The First

Amendment simply does not reach such decisions.  Id.

     Significantly for the instant case, the Court of Appeals considered what the result

would be if the Commission had placed one of the animal sculptures in one of the

District's public buildings.  The Court emphatically declared that "[t]here could be no

persuasive argument that the First Amendment would prohibit the Commission from engaging in viewpoint discrimination when it decided which designs to accept and which to reject." Id. at 29.  The Court declared this hypothetical to be indistinguishable from a government art museum, where the government can exercise broad discretion to decide which art pieces to display, engaging in viewpoint discrimination in its selection choices should it so desire.  See id. at 29-30.  See also, e.g., Oberwetter v. Hilliard, 680 F.3d 545 (D.C. Cir. 2011) ("the government is free to establish venues for the exclusive expression of its own viewpoint.")[1]

Thus, the fact that private parties are involved in creating the art, and helping to select a piece of art for consideration by Congress, in no way undermines the nature of the government speech at issue here.

### C.    Government Speech Does not Implicate the Free Speech Clause of the First Amendment.

Not only does the government have a right to its own speech, but when it exercises that right the Free Speech Clause of the First Amendment is not implicated.  Summum, 555 U.S. at 467.  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." Id.

In Walker the Supreme Court reiterated that "[w]hen the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Id. at 2245.  "[G]overnment statements (and government actions and programs that take the form of speech)

---

[1] The instant case is unlike the facts at issue in Freedom from Religion Foundation, Inc. v. Abbott, Civil No. 16-0233, 2016 WL 7388401 (W.D. Tex. Dec. 20, 2016), in which the Court found genuine issues of material fact concerning plaintiff's First Amendment claim about a private exhibit displayed in the Texas State Capitol.  In that case, unlike here, the government expressly distanced itself from the art display with a posted disclaimer stating "Private display, not endorsed by the state." Id. at *5.

do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." Id. at 2245-46.  The Court emphasized its prior holding in Bd. of Regents of Univ. of Wis. System v. Southworth, that "'the government can speak for itself[,]'" and need not, when doing so, include alternative views.  Walker, 135 S. Ct. at 2246, *quoting* Southworth, 529 U.S. at 229.

Similarly the Court stated in Summum that not only does the government have a right to its own speech, but when it exercises that right the Free Speech Clause of the First Amendment is not implicated.  Summum, 555 U.S. at 467.  "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  Id.

In light of the fact that the First Amendment Free Speech Clause does not apply to government speech, plaintiffs' argument regarding the forum of the speech is misplaced.  The forum analysis applies in the First Amendment context when the government regulates private speech.  See, e.g., Perry Educational Ass'n v. Perry Local Educators, 460 U.S. 37, 44 (1983). Plaintiffs' Mem. at 15.   The Court of Appeals in PETA made clear that the forum analysis is inapplicable to government speech.

In PETA the plaintiff argued that the city's sponsorship of the "Party Animals" program created a limited public forum in which the government could limit the subject of the program but could not discriminate based on viewpoint.  PETA, 414 F.3d at 28.  The Court of Appeals disagreed.  The Court concluded that "public forum principles 'are out of place in the context of this case.'"  Id., *quoting* United States v. American Library Ass'n, 439 U.S. 194, 205 (2003) (plurality opinion).  As the Court noted, "[p]ublic forums and designated public forums give private speakers an easement to use public property."  PETA, 414 F.3d at 29.  The "Party Animals" Program created no easement for private speakers to use public property.  Id.

In explaining its conclusion, the Court of Appeals pointed to an analogy applicable here

when the Court stated:

> First, suppose that instead of placing the elephants and donkeys on sidewalks and in parks, the Commission placed them in one of the District's public buildings. *There could be no persuasive argument that the First Amendment would prohibit the Commission from engaging in viewpoint discrimination when it decided which designs to accept and which to reject.* The hypothetical is indistinguishable from a government art museum and from this case.

Id. (emphasis added).

If the Party Animals Program in PETA failed to constitute a designated or limited public forum, the Competition here similarly fails. Indeed, there is little meaningful difference between the two programs. The Party Animals Program was the mechanism by which the District of Columbia selected pieces of art to display on public spaces. The Competition here is the mechanism by which Congress decided which pieces of art to display on the walls of the Cannon Tunnel. In neither case was a limited public forum created. If there could be "no persuasive argument that the First Amendment would prohibit the Commission" from deciding which pieces to select to place inside a District public building, there likewise can be "no persuasive argument" that the First Amendment would prohibit Congress from deciding which pieces of art chosen by its Competition it wanted to place on the walls of the Cannon Tunnel in the Capitol Building. PETA, 414 F.3d at 29.

Plaintiffs' argument to the contrary could wreak havoc on the government's role as a patron of the arts. Under plaintiffs' theory if the National Gallery of Art received private funds to help defray the cost of an exhibition, or allowed private parties to help select which pieces of art would be part of an exhibition, this would somehow transform the National Gallery of Art into a limited public forum creating First Amendment rights in artists who arguably fell within the guidelines of a particular exhibition. The Court of

21

Appeals in PETA pointed to this as an example of the natural extension of the plaintiffs'

argument in that case and rejected such a result.  Id., 414 F.3d at 30.  The same result is

warranted here, given that the natural extension of plaintiffs' argument here would have

the same result.

As the Court of Appeals held in PETA, "[t]he First Amendment's Free Speech Clause

does not apply to the government as communicator."  Id., 414 F.3d at 30-31.  It would be strange

indeed to hold that the government may not favor its own expression in a tunnel in its own

building where the speech at issue is sponsored by Members of Congress acting in their official

capacities as patrons of the arts on behalf of Congress.[2]

### D.     Plaintiffs' Challenge to the Suitability Guidelines Fails.

Plaintiffs argue that the Suitability Guidelines used by the Architect of the Capitol are

unconstitutionally vague.  Plaintiffs' Mem. at 26.   But as plaintiffs recognize, the constitutional

concept of vagueness under the First Amendment applies only in situations where the

government regulates the conduct of private parties in an arena where the private party has a

right to engage in First Amendment speech.  Id.  Here, although the Guidelines regulate the type

of art a private person seeks to have selected for display on the Cannon Tunnel, the private

person has no right to have his or her art displayed at that location, even after winning the

Competition.   A Member has to select and sponsor the art displayed at this location, the

---

[2]  Because the art display at issue constitutes government speech not subject to the First
Amendment, plaintiffs' argument about viewpoint discrimination is inapplicable.  See Plaintiffs'
Mem. at 17-22.  Nonetheless, defendant notes that no viewpoint discrimination occurred here.
The Architect, and the House Office Building Commission, addressed a specific complaint raised
about the Pulphus art, and that complaint was resolved in accordance with the House of
Representatives' procedures.  No complaints were raised about any other pieces of art on display
and thus they were not re-reviewed for adherence to the Guidelines.  Ayers Decl., at ¶ 26.

Member has every right to reject a winning entry, and overall control of the display is exercised by the Architect subject to review by the House Office Building Commission.

The Guidelines pertain to the government speech occurring in the Cannon Tunnel. Plaintiffs cite no authority that the government, as speaker, must establish guidelines that pass First Amendment constitutional muster with respect to the vagueness doctrine.  Indeed, such a concept makes no sense.  If the government as speaker may select whatever speech it wants, such as whatever art it wants to display in its own space, it can do so with no guidelines whatsoever or any type of guidelines of its choosing.

Moreover, plaintiffs' attempt to demonstrate that the phrase "subjects of contemporary political controversy or a sensationalistic or gruesome nature" is unduly vague is without merit. The Court of Appeals in United States v. Bronstein, No. 16-3003, 2017 WL 836091 (D.C. Cir. Mar. 3, 2017), recently reemphasized that the vagueness inquiry looks to whether a regulation contains no standard of conduct at all, not whether it contains a standard that may be imprecise and susceptible to differing interpretations. Id. at *4.  When persons of ordinary intelligence would understand the behavior being regulated, a vagueness challenge cannot successfully lie. Griffin v. Secretary of Veterans Affairs, 288 F.3d 1309, 1330 (Fed. Cir. 2002).

Here, it cannot reasonably be advanced that a painting showing two police officers with apparent warthog heads pointed a gun at a young man with the head and tail of a black wolf, while in the background protesters look on and another officer arrests another young black man, described by the artist as "Deep expressions on difficult times in our community" does not depict a contemporary political controversy or is not sensationalistic or gruesome.  Plaintiffs' Mem. at 6.  Even plaintiffs concede that the Pulphus art "arguably" falls within the prohibition on "subjects of contemporary political controversy," although plaintiffs also claim that the art

cannot be considered "contemporary" because this country has a history of policing associated with racial strife gets them nowhere.  Plaintiffs' Mem. at 19, 27.  Issues that have plagued this country for years can still be a contemporary problem; plaintiffs' claim to the country is without merit.

Therefore, given that the concept of unconstitutional vagueness does not apply to government speech, and that the Pulphus art easily fails within the Suitability Guidelines' prohibited exhibits, plaintiffs' claims that the Suitability Guidelines are unconstitutionally vague must fail.

## II.    Plaintiffs Have Suffered no Irreparable Injury.

Plaintiffs argue that it is well established that a denial of First Amendment rights constitutes irreparable harm.  Plaintiffs' Mem. at 31.  But as demonstrated above, plaintiffs have been denied no First Amendment rights.  Given that their claim to irreparable harm rests solely on their succeeding on the merits of their First Amendment claims, which they cannot, it necessarily follows that plaintiffs have failed to demonstrate the requisite harm necessary for the entry of a preliminary injunction.

## III.    Harm to the Government and the Public Interest Favor Denial of a Preliminary Injunction

Plaintiff argues that requiring defendant to display plaintiffs' art exhibit will cause no harm to the government because the art was displayed in the Cannon Tunnel for seven months until it was taken down.  Plaintiffs' Mem. at 31-32.  Plaintiffs misunderstand the harm at issue here.

An injunction is an equitable remedy which is issued or denied in the sound discretion of the Court.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982).  As the Supreme Court has pointed out, "in exercising their sound discretion, courts of equity should pay particular

regard for the public consequences in employing the extraordinary remedy of injunction." Id. at 312.

Plaintiffs' suit asks this Court to become entangled in what is essentially a dispute between Members of Congress as to what kind of art should be displayed on the walls of the Cannon Tunnel. Congress has the right to decide what kind of art to display on the walls of its buildings. As the First Circuit noted in Newton v. Lepage, 700 F.3d 595 (1st Cir. 2012), "[m]any cases recognize that the government must have some discretion as to the choice of art it puts on the walls of its offices, even where the government is acting as an arts patron." Id. at 603. The government's ability to exercise its discretion in this regard would be harmed by the entry of an injunction requiring it to display art it does not support. As demonstrated above, the public would view any art displayed as art endorsed by Congress. The public elects Members of Congress and has a public interest in having its elected officials chose the art to be displayed on the walls of the Capitol and House and Senate Buildings and their connecting tunnels. That is what happened here: the dispute about the suitability of "Untitled #1" was elevated to, and decided by, the House Building Commission.

As the Walker Court recognized, if the Free Speech Clause were to be interpreted to require government speech to include messages the government did not endorse, the government would not work. Id., 135 S. Ct. at 2246. Although an art display differs from the recycling program example addressed in Wright, the principle remains that the government must be free to select the message it wishes to convey, especially on the walls of its own buildings.

Accordingly, the government and public interest in maintaining control over the art displayed in the Cannon Tunnel clearly outweighs plaintiffs' non-existent First Amendment rights to try and control the art displayed in this government location.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied.

CHANNING D. PHILLIPS
D.C. BAR # 415793
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN
D.C. BAR # 924092
Civil Chief

/s/ Marina Utgoff Braswell
D.C. Bar # 416587
Assistant United States Attorney
Christopher C. Hair
Special Assistant U.S. Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
Telephone: (202) 252-2561
Marina.Braswell@doj.gov
Christopher.Hair@usdoj.gov