IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID PULPHUS and REPRESENTATIVE WILLIAM LACY CLAY, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 17-cv-00310-JDB |
| v. | ) ) | |
| STEPHEN T. AYERS, in his official capacity as Architect of the Capitol, | ) ) ) | |
| Defendant. | ) ) | |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Leah J. Tulin
(DC Bar No. 988003)
Caroline M. DeCell
(DC Bar No. 1015491)
Tassity S. Johnson*
Satenik Harutyunyan*
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

Erwin Chemerinsky
(DC Bar No. 289330)
401 East Peltason Drive
Educ 1095
Irvine, CA 92697-8000
(949) 824-7722

Kymberly K. Evanson
Athan P. Papailiou
Pacifica Law Group
1191 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 245-1700

Laurence H. Tribe**
420 Hauser Hall
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767

James M. Williams**
Chehardy Sherman Williams
One Galleria Blvd., Suite 1100
Metairie, LA 70001
(504) 962-4287

*Not admitted in D.C.; supervised
by principals of the Firm.

**Admitted *pro hac vice*

90002 00069 gc104s17rq

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................2

    I.    Plaintiffs Have Standing. ........................................................................................2

        A.    Representative Clay's Injuries Are Personalized, Concrete, and Legally Cognizable. ......................................................................................2

        B.    Plaintiffs' Injuries Are Fairly Traceable To The AOC's Decision To Disqualify And Remove Mr. Pulphus's Painting. ...................................5

    II.    Plaintiffs Are Likely To Prevail On Their Claim That Defendant Violated Their First Amendment Rights To Free Speech. ......................................................8

        A.    The Competition is Not Government Speech. .............................................9

            1.    The Competition Is Not A Traditional Medium For Government Speech Nor Is It Perceived As One..........................10

            2.    The Government Does Not Maintain Editorial Control Over the Works in the Competition. ...............................................14

            3.    The Competition Does Not Deliver a "Government-Controlled Message."...................................................................16

        B.    The Retroactive Disqualification Of "Untitled #1" Was Impermissible Viewpoint Discrimination In A Limited Public Forum. ......................................................................................................19

        C.    The Suitability Guidelines Are Unconstitutionally Vague. ......................22

    III.    The Continued Deprivation of Plaintiffs' First Amendment Rights Constitutes Irreparable Harm. ..............................................................................24

    IV.    The Balancing Of Equities Support Reinstating Untitled #1 In The Competition.............................................................................................................24

CONCLUSION...........................................................................................................................25

i

# TABLE OF AUTHORITIES

## Federal Cases

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y*
  *Freedom Found. v. District of Columbia,*
  846 F.3d 391 (D.C. Cir. 2017) ................................................................. 23

*Animal Legal Def. Fund, Inc. v. Glickman,*
  154 F.3d 426 (D.C. Cir. 1998) ................................................................... 6

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................... 8

*Bible Believers v. Wayne Cty.,*
  805 F.3d 228 (6th Cir. 2015) ................................................................... 21

*Bryant v. Gates,*
  532 F.3d 888 (D.C. Cir. 2008) ................................................................. 13

*Burnham v. Ianni,*
  119 F.3d 668 (8th Cir. 1997) ................................................................... 21

*Campbell v. Clinton,*
  203 F.3d 19 (D.C. Cir. 2000) ..................................................................... 3

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ................................................................................... 22

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ................................................................... 5

*Cmty. for Creative Non-Violence v. Kerrigan,*
  865 F.2d 382 (D.C. Cir. 1989) ................................................................. 10

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) ..................................................................... 5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ........................................................................... 11, 20

*DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.,*
  477 F.3d 758 (D.C. Cir. 2007) ........................................................... 13, 16

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................. 24

*Forsyth Cty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ........................................................................................... 21

*Freedom from Religion Found., Inc. v. Abbott*,
  No. A-16-CA-00233-SS, 2016 WL 7388401 (W.D. Tex. Dec. 20, 2016) ............................... 11

*\*Gerlich v. Leath*,
  847 F.3d 1005 (8th Cir. 2017) .................................................................. 12, 19, 20

*Good News Club v. Milford Cent. Sch.*,
  533 U.S. 98 (2001) ............................................................................................. 12

*Griffin v. Secretary of Veterans Affairs*,
  288 F.3d 1309 (Fed. Cir. 2002) ............................................................................ 24

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015),
  *cert. denied*, 136 S. Ct. 2009 (2016) .................................................................... 22

*Johanns v. Livestock Mktg. Ass'n*,
  544 U.S. 550 (2005) ............................................................................................ 16

*Kucinich v. Bush*,
  236 F. Supp. 2d 1 (D.D.C. 2002) ..................................................................... 3, 17

*Kucinich v. Obama*,
  821 F. Supp. 2d 110 (D.D.C. 2011) ........................................................................ 3

*\*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ............................................................................ 12, 13, 16, 20

*Lincoln Property Co. v. Roche*,
  546 U.S. 81 (2005) ............................................................................................... 5

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................... 4, 7

*McMahon v. City of Panama City Beach*,
  180 F. Supp. 3d 1076 (N.D. Fla. 2016) ................................................................. 21

*Meese v. Keene*,
  481 U.S. 465 (1987) ............................................................................................. 5

*Meyer v. Grant*,
  486 U.S. 414 (1988) ............................................................................................. 5

*\*Miller v. City of Cincinnati*,
  622 F.3d 524 (6th Cir. 2010) ........................................................................... 11, 13

iii

*NAACP v. City of Philadelphia*,
  39 F. Supp. 3d 611, 634 (E.D. Pa. 2014),
  *aff'd sub nom. NAACP v. City of Philadelphia*,
  834 F.3d 435 (3d Cir. 2016) ............................................................................... 11

*National Parks Conservation Ass'n v. Manson*,
  414 F.3d 1 (D.C. Cir. 2005) ................................................................................... 8

*Newton v. LePage*,
  700 F.3d 595 (1st Cir. 2012) ............................................................................... 18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) .................................................................................. 12, 20

*PETA v. Gittens*,
  414 F.3d 23 (D.C. Cir. 2005) ....................................................................... 17, 18

*Pleasant Grove v. Summum*,
  555 U.S. 460 (2009) ................................................................................... passim

*R.J. Reynolds Tobacco Co. v. U.S. FDA*,
  823 F. Supp. 2d 36 (D.D.C. 2011) ..................................................................... 24

*Raines v. Byrd*,
  521 U.S. 811 (1997) ...................................................................................... 2, 3

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013),
  *aff'd*, 785 F.3d 19 (D.C. Cir. 2015) .......................................................... 4, 6, 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .............................................................................. 12, 16, 20

*Shays v. Federal Election Comm'n*,
  414 F.3d 76 (D.C. Cir. 2005) ............................................................................... 6

*Smith v. Goguen*,
  415 U.S. 566 (1974) ........................................................................................... 23

*Stewart v. D.C. Armory Bd.*,
  789 F. Supp. 402 (D.D.C.1992) ......................................................................... 24

*United States v. Ballin*,
  144 U.S. 1 (1892) ............................................................................................... 13

*United States v. Bronstein*,
  No. 16-3003, — F.3d — 2017 WL 836091, (D.C. Cir. Mar. 3, 2017) ................. 23

iv

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
  135 S. Ct. 2239 (2015) .................................................................................................. passim

**Federal Statutes**

2 U.S.C. § 2001 ................................................................................................................... 7

**Rules**

Federal Rule of Civil Procedure 15 .................................................................................... 5

Federal Rule of Civil Procedure 19 .................................................................................... 5

**Other Authorities**

*Priorities of the House Officers & Leg. Branch Entities for FY18 and Beyond (Panel One):*
  *Hearing Before the H. Comm. On Admin.*, 115th Cong. (2017),
  https://www.youtube.com/watch?v=Mb8PwmNws0Q ........................................................ 21

# INTRODUCTION

In its brief opposing Plaintiffs' Motion for Preliminary Injunction, the Architect of the Capitol (the "AOC" or "Defendant") concedes that his decision to disqualify 19-year-old Plaintiff David Pulphus's painting ("Untitled #1" or the "Painting") from the Congressional Art Competition (the "Competition") was the first of its kind, and was prompted by the complaints of a handful of lawmakers stirred up by right-wing media. While attempting to frame the Competition as "government speech," the AOC divulges its long-standing practice of always deferring to the preferences of individual Members of Congress when making suitability determinations regarding the content of the artwork they have sponsored. Always, that is, until now. According to the AOC's own declarants, Representative Clay is the first and only Member of Congress not to be afforded similar deference. And despite providing three detailed declarations, the AOC has yet to explain on what basis "Untitled #1" was excluded. In short, the AOC's declarants have corroborated Plaintiffs' case, demonstrating that the AOC departed from its past practice to single out "Untitled #1" and treat it, its artist, and its sponsor, differently than any other work in the Competition's 35-year history. The AOC's actions are not only insulting to Plaintiffs, but also unconstitutional viewpoint discrimination.

Moreover, the AOC fails to dispute Plaintiffs' viewpoint discrimination claim, arguing instead that Plaintiffs lack standing to sue and that the involvement of Members of Congress in the Competition renders it government speech unprotected by the First Amendment. The AOC's standing argument is easily disposed of: the AOC's retroactive disqualification of "Untiled #1" continues to cause concrete and particularized harm to both Representative Clay and Mr. Pulphus, and that harm is fairly traceable to the AOC's actions. As to government speech, while the Supreme Court recognized in *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009), that "[t]here may be situations in which it is difficult to tell whether a government entity is

speaking on its own behalf or is providing a forum for private speech," this is not such a case. Here, each of the factors identified in *Summum* and its progeny weigh uniformly toward a finding that the Competition is not government speech, but rather is a limited public forum in which Plaintiffs' First Amendment rights were abridged. As detailed below, there is no "government controlled message" in the Competition, nor any history, perception, or practice of the government exercising editorial control over the submissions.

Because Plaintiffs have standing and the Competition is not government speech, Plaintiffs are likely to succeed on the merits of their claims that the retroactive disqualification of "Untitled #1" was impermissible viewpoint discrimination. Plaintiffs have likewise shown irreparable harm and that the public interest supports entry of an injunction. Plaintiffs' Motion should be granted.

## ARGUMENT

Defendant raises two primary arguments in opposition to Plaintiffs' motion for a preliminary injunction. First, Defendant argues that Plaintiffs lack standing to sue the AOC. Second, Defendant argues that Plaintiffs do not have any First Amendment rights because the Competition constitutes government speech. Neither of these arguments has merit.

## I.      Plaintiffs Have Standing.

### A.  Representative Clay's Injuries Are Personalized, Concrete, and Legally Cognizable.

Defendant states that because Representative Clay's "claimed injury flows from . . . official actions taken on behalf of his constituents, as opposed to any personal actions, he lacks standing to pursue his claims." Opp'n at 11. This conclusory argument both misapprehends the nature of Representative Clay's injury and misapplies the principles articulated in *Raines v. Byrd*, 521 U.S. 811 (1997), the only case that Defendant cites in support thereof.

Although Representative Clay's injury does "flow[] from" his role as a U.S. Representative—and, more specifically, as a Member of Congress who chose to participate in the Competition—it is not analogous to the injury that the plaintiffs suffered in *Raines*.  There, the Supreme Court held that an alleged institutional diminution of legislative power caused by the passage of the Line Item Veto Act was insufficient to constitute a concrete personal injury for purposes of Article III, as it "necessarily damage[d] all Members of Congress and both Houses of Congress."  *Raines*, 521 U.S. at 820-21, 830.  Here, in contrast, Representative Clay is not alleging a diminution of legislative power or, indeed, any injury relating to the legislative function of his role as a U.S. Representative.  The reasoning that led the *Raines* Court to conclude that the plaintiff-legislators in that case lacked standing is therefore inapposite.  *Cf. Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (finding no standing for the congressperson plaintiffs because "Congress has a broad range of legislative authority it can use to stop a President's war making . . . and therefore under *Raines* congressmen may not challenge the President's war-making powers in federal court" (internal citations omitted)); *see also Kucinich v. Obama*, 821 F. Supp. 2d 110, 118 (D.D.C. 2011); *Kucinich v. Bush*, 236 F. Supp. 2d 1, 8 (D.D.C. 2002).

Rather, Representative Clay's injury flows from being prevented from sponsoring and showcasing Mr. Pulphus's painting in the Competition, both of which are imbued with an expressive component that cuts across Representative Clay's personal interests and his official duties as a representative of his constituents.  *Cf. Raines*, 521 U.S. at 830-31 (Souter, J., joined by Ginsburg, J., concurring in the judgment) (noting the "difficulty in applying the rule that an injury on which standing is predicated be personal, not official" and explaining that "the significance of this distinction is not so straightforward").  That injury is both legally cognizable

3

and sufficiently personal, concrete, and particularized to meet Article III's injury-in-fact requirement.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992) (establishing injury-in-fact standard and observing that, if the plaintiff is "an object" of the challenged government action or inaction, "there is ordinarily little question that the action or inaction has caused him injury, and that judgment preventing or requiring the action will redress it"); *Rangel v. Boehner*, 20 F. Supp. 3d 148, 163 (D.D.C. 2013), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 218 (2015) (finding a cognizable and sufficiently personal injury because "being censured by the U.S. House of Representatives concretely and particularly harms a sitting Member's reputation").

Defendant implicitly acknowledges that Representative Clay holds a direct expressive interest in the display of the winning work from his district by recognizing that each participating Member in the Competition "has to select and sponsor the art displayed" in the Cannon Tunnel and "has every right to reject a winning entry."  Opp'n at 22-23.  Likewise, Defendant's own evidence demonstrates the personal and particularized nature of Representative Clay's injury, revealing that in *every* other circumstance in which a question regarding the suitability of the content of a painting has been brought into question, the AOC has deferred to the discretion of individual Members of Congress and respected their decision whether to continue to sponsor the artwork and, by extension, whether the art would be displayed in the Competition exhibition. *See* Opp'n at 6; Declaration of Barbara Wolanin ("Wolanin Decl.") ¶ 5; Declaration of Michele Cohen ("Cohen Decl.") ¶ 10; *id.* at Exs. 2-5.  Here, by contrast, the AOC removed "Untitled #1" over Representative Clay's objection, an action that stifled the expression of support that Representative Clay's sponsorship of the Painting conveyed and that prevented him from

4

representing his district in the Competition.[1]  *Cf. Meyer v. Grant*, 486 U.S. 414, 422-23 (1988) (recognizing that government action that reduces the size of a speaker's audience can constitute an invasion of a legally protected interest).

### B. Plaintiffs' Injuries Are Fairly Traceable To The AOC's Decision To Disqualify And Remove Mr. Pulphus's Painting.

Although it is undisputed that the AOC retroactively disqualified "Untitled #1" from the Competition and had it removed from the Cannon Tunnel, the AOC argues that both Plaintiffs lack standing to sue the AOC because Representative Clay sought review of the AOC's actions by the House Office Building Commission ("HOBC"), and that therefore their injuries are not traceable to the AOC's actions.  This argument fails for multiple reasons.[2]

First, insofar as artwork submitted through the Competition is concerned, the AOC has the "discretion" to make the "[f]inal decision" regarding the "suitability for exhibition in the Capitol."  Declaration of Stephen Ayers ("Ayers Decl."), Ex. 4.  The HOBC delegated this authority to the AOC through its approval of the February 8, 1982 proposal submitted by the AOC "[p]ursuant to [the HOBC Chairman's] request."  *Id.*  Consistent with that proposal, the

---

[1] It bears noting that, for purposes of standing, whether Representative Clay's First Amendment claim ultimately prevails is of no moment.  *See City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."); *see also Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013).  In other words, whether Representative Clay's First Amendment rights have in fact been abridged—which they have—is irrelevant to the resolution of whether he has standing to bring suit.  *Meese v. Keene*, 481 U.S. 465, 473 (1987).

[2] Defendant's standing argument is in fact little more than an argument about the sufficiency of Plaintiffs' complaint under the Federal Rules of Civil Procedure that has been dressed up into an argument about Article III justiciability.  *Cf. Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005) (noting that Federal Rule of Civil Procedure 19 "address[es] party joinder, not federal-court subject-matter jurisdiction").  Thus, even if this Court were to agree with the AOC that the HOBC is a required party to this action (which it is not), such a deficiency could easily be cured by amending Plaintiffs' Complaint to join the HOBC as a defendant.  *See* Fed. R. Civ. P. 15, 19.

5

current Competition rules also provide that the "final decision regarding the suitability of all artwork for the 2016 Congressional Art Competition exhibition in the Capitol will be made by a panel of qualified persons chaired by the Architect of the Capitol."  Declaration of Representative William Lacy Clay ("Clay Decl.") Exs. B-2, B-3.  Accordingly, the AOC had actual authority over the panel members who reviewed "Untitled #1" and who ultimately hung "Untitled #1" in the exhibition on June 9, 2016.  Cohen Decl. ¶¶ 2-3.

Second, it was the AOC who elected to engage in the retroactive "re-review" of "Untitled #1" at the request of Representative Reichert, despite the prior determination of his panel members to hang the Painting and its nearly seven months of uninterrupted display.  Ayers Decl. ¶ 22.  After the AOC's consultation with "industry experts," the AOC directed his staff to remove the Painting, though in neither his letter to Representative Clay nor his declaration submitted in this case has he explained the basis for the determination that the Painting did not meet the Suitability Guidelines.  Ayers Decl. ¶¶ 22-23.  Because the removal of the Painting is traceable to the AOC's actions, a justiciable controversy exists between the AOC and Plaintiffs. *See Shays v. FEC*, 414 F.3d 76, 92-93 (D.C. Cir. 2005) ("[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc))); *cf. Rangel*, 20 F. Supp. 3d at 161 (no standing where plaintiff's injury resulted from a censure by the House of Representatives as an independent body, which was not a party to the case, not by defendants who were individual members of Congress).  Thus, the AOC is the proper defendant before this Court.

The fact that Representative Clay sought to "appeal" the AOC's decision to the HOBC does not change the traceability of Plaintiffs' injuries to the actions of the AOC.  There is no statutory requirement that decisions of the AOC be appealed to the HOBC.  Therefore, had Representative Clay elected *not* to seek review by the HOBC, his suit would not have been barred for failure to exhaust administrative remedies.  The AOC cites no authority for its claim that seeking a discretionary administrative appeal destroys the traceability showing needed to establish Article III standing, and Plaintiffs are not aware of any such authority.

Nor is there any support for the AOC's suggestion that the HOBC was an "independent actor" causing Plaintiffs' injuries.  Opp'n at 12 (citing *Lujan*, 504 U.S. at 562).  Although the AOC appears to rely on 2 U.S.C. § 2001 for the proposition that the HOBC is responsible for Plaintiffs' "current injuries," *see* Opp'n at 8, that statute does not recognize the HOBC as the final arbiter of the Competition.  Rather, the statute generally confers "supervision and control" to the AOC for the "protection, care, and occupancy" of the House of Representatives Office Building, subject only to the "approval and direction" of the HOBC.[3]  Defendant also appears to rely on this general supervisory provision in asserting that the HOBC "resolves any disputes among the Members about the art to be displayed," but points to *no* evidence that the HOBC has ever in fact exercised such a function, other than via Representative Clay's request for HOBC review.  Opp'n at 15; *see id.* at 8-9.  As noted above, the HOBC exercised its "approval and direction" by vesting final and exclusive authority over the Competition in the AOC.

---

[3] 2 U.S.C. § 2001 ("The House of Representatives Office Building, which shall hereafter be designated as the House Office Building and the employment of all service, other than the United States Capitol Police, that may be appropriated for by Congress, necessary for its protection, care, and occupancy, shall be under the control and supervision of the Architect of the Capitol, subject to the approval and direction of a commission consisting of the Speaker of the House of Representatives and two Representatives in Congress, to be appointed by the Speaker.").

7

Moreover, even if the HOBC's decision also contributed to Plaintiffs' injuries, the AOC's effort to shift all liability to the HOBC functionally raises the type of "final link" argument that has been squarely rejected by the Supreme Court. *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (requirement that an alleged injury be fairly traceable to the defendant's action does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm). Put differently, the fact that Representative Clay sought redress for the violation of his First Amendment rights to the HOBC does not negate the fact that the Plaintiffs' injuries are readily traceable to the AOC's conduct. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5-7 (D.C. Cir. 2005) (organizations whose members used two federal land areas had standing to challenge an environmental determination by the Department of Interior, even though a state agency, rather than Interior, issued the permit actually authorizing the project).

Finally, in the event that this Court grants Plaintiffs' motion and issues a preliminary injunction, there is no reason to believe that the AOC would not comply with this Court's order and redress the constitutional violation, nor has it disclaimed the ability (or willingness) to do so. In sum, the undisputed evidence demonstrates that the AOC's conduct caused the Plaintiffs' injuries, and no intervening "approval" of the HOBC can shield the AOC from liability or deprive the Plaintiffs of standing to challenge its conduct.

## II.     Plaintiffs Are Likely To Prevail On Their Claim That Defendant Violated Their First Amendment Rights To Free Speech.

The AOC does not meaningfully refute Plaintiffs' viewpoint discrimination claims, nor does it contest that the deprivation of First Amendment rights constitutes irreparable harm. Rather, the AOC's only defense for the retroactive disqualification of "Untitled #1" is that the Competition is government speech. The AOC is wrong. None of the scant authority cited in its opposition supports application of a government speech defense here.

8

Having placed of all its eggs in the government speech basket, Defendant has failed to contest Plaintiffs' core arguments on the merits of the First Amendment claim, effectively conceding both that the Competition is a limited public forum and that the removal of "Untitled #1" from the Cannon Tunnel was neither viewpoint neutral nor reasonable in light of the purpose of the Competition.  Defendant's attempt at defending the constitutionality of the Suitability Guidelines against Plaintiffs' void-for-vagueness claim is likewise unpersuasive.  Accordingly, Plaintiffs are substantially likely to prevail on the merits of their First Amendment claim.

### A.  The Competition is Not Government Speech.

For the Competition to be "government speech," this Court must conclude that the Competition is "meant to convey and ha[s] the effect of conveying a government message." *Summum*, 555 U.S. at 472.  To meet that standard, the AOC must show that the government has historically used the Competition to communicate a message to the public, that the public has traditionally perceived the government to be the speaker, and the government maintains direct editorial control over the speech.  *See, e.g.*, *Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 135 S. Ct. 2239, 2247-49 (2015); *Summum*, 555 U.S. at 467-68.  As to the first and second factors, the AOC submitted no evidence that the Competition has been historically used to communicate a message or that it is perceived as doing so, and it failed to rebut Plaintiffs' evidence to the contrary.  More pointedly, the AOC's own declarations confirm that the AOC in fact exercises no editorial control over the submissions to the Competition and instead defers entirely to individual Members' judgments about the works they wish to sponsor.

As such, under *Summum* and *Walker*, the Competition is a forum for private speech protected by the First Amendment, and the government speech defense does not apply.

9

### 1. The Competition Is Not A Traditional Medium For Government Speech Nor Is It Perceived As One.

The AOC does not attempt to demonstrate that the *Competition* has been used to communicate a message from the government or that it is perceived to convey any such message. The AOC's reliance on *Summum* and *Walker* is therefore misplaced.  In holding that the City Park's display constituted government speech, the *Summum* Court traced the long history of government speech via the "selective receptivity" of *permanent* monuments, and distinguished temporary displays of protected First Amendment activity as outside the ambit of government speech.  In doing so, the Court repeatedly invoked the "permanent" nature of the monuments at issue, the public's perception of government endorsement of a permanent monument, and the resulting practical space limitations that would result if the City were required to accept all donations of permanent monuments.  555 U.S. at 478-79.  Similarly, in *Walker*, the Court relied on the long history of license plates being used to communicate messages from the States, and the public's reasonable perception that license plates stamped with official vehicle identification numbers carried the imprimatur of the state of Texas.  *Walker*, 135 S. Ct. at 2248.

Relying on *Summum*, the AOC argues generally that the government "traditionally speaks to the public through the monumental buildings and grounds of the Capitol campus."  Opp'n at 14.  According to the AOC, "[t]he Capitol Campus is where Members of Congress send their message to the public by enacting laws that govern public behavior."  Opp'n at 14.  On this basis, the AOC claims that "Congress decides how it desires to encourage such creative endeavors consistent with the appropriate level of decorum for the institution."  Opp'n at 15.  As a threshold matter, the AOC ignores the authority from this Circuit holding that the Capitol Campus is in fact a traditional public forum and is routinely the site of protected First Amendment activity.  *See, e.g.*, *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 387

90002 00069 gc104s17rq

(D.C. Cir. 1989) ("no doubt that the Capitol Grounds are a public forum") (internal citations omitted).  Furthermore, Plaintiffs do not seek to construct a permanent monument on the Capitol Campus that would interfere with the government's lawmaking power or the manner in which the government "traditionally speaks" via permanent monuments located there.  Rather, Plaintiffs seek only to display the Painting for less than three months.

Moreover, the relevant inquiry is not whether the Capitol Campus is used by the government to convey a message, but whether the *Competition* is.  *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800-01 (1985) (relevant forum was charitable contribution program, not the government buildings in which the program took place).  By looking to the "Capitol Campus," the AOC in effect argues that any government building used to create laws or policy is exempt from the First Amendment by virtue of the government's "speaking" through its lawmaking, regardless of the forum established by a particular government program taking place on the property.  But this simply is not the law.  *See id.*; *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010) (connection between events taking place at City Hall and official government views "is simply too attenuated" to constitute government speech); *Freedom from Religion Found., Inc. v. Abbott*, No. A-16-CA-00233-SS at 5, 2016 WL 7388401 (W.D. Tex. Dec. 20, 2016) (exhibits in Texas Capitol building were not government speech, despite State Board's final approval authority over which exhibits were displayed, because private citizens used area to display exhibits containing their own messages); *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 634 (E.D. Pa. 2014), *aff'd sub nom. NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016) (advertisement space in airport not government speech).  As such, the Court must look to the history and perception of the Competition, not the Capitol, to evaluate the AOC's government speech defense.

11

Here, the undisputed record demonstrates that the government has not historically communicated through the Competition.  The AOC concedes that the Competition has no prescribed theme or mission beyond "encouraging artistic expression" of private speakers, no budget, and no dedicated staff.  The AOC fails to cite any case finding government speech on the basis of such a diffuse program.  Likewise, the fact that government funds are indirectly spent via the participation of AOC or House staff in the administration of the Competition does not transform it into a medium for government communication.  To the contrary, First Amendment jurisprudence is replete with examples of involvement by government employees in supporting the operation of public and nonpublic fora without converting such activities into government speech.[4]  *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (public school facilities used by private groups); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) (university funding student publications); *Cornelius*, 473 U.S. 788 (combined federal campaign); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) (public school mail system); *Gerlich v. Leath*, 847 F.3d 1005 (8th Cir. 2017) (public university-administered trademark licensing regime).  Likewise, numerous courts have rejected a government speech defense even where the government is actively spending its funds beyond the employment or utilization of staff.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (legal services attorney not speaker for government despite funding subsidy for program);

---

[4] Taken to its logical end, the AOC's argument would preclude First Amendment challenge altogether because government staff is always at least tangentially implicated when public facilities are in use. *See* Opp'n at 15 ("Although the Competition does not have its own separate staff, there are government personnel who create, monitor and control the Competition.").

12

*Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (applying forum analysis, not government speech analysis, to a military newspaper).[5]

There is likewise no evidence that the government is perceived as speaking through the students' art. *Compare Velazquez*, 531 U.S. at 542 (legal services attorney not speaker for government despite funding subsidy for program), *with DKT Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 477 F.3d 758, 761 (D.C. Cir. 2007) (in funding HIV prevention program, government entitled to choose its own agents and require them to convey a specific message). Each work is displayed with a label that clearly identifies the artist and the Member of Congress who sponsors the work, and the sign at the entrance to the exhibit identifies the display as a "High School Art Competition." Declaration of Kymberly K. Evanson ("Evanson Decl."), Ex. G. No reasonable viewer would infer that 400 high-school art students whose work covers subjects ranging from still life fruit and animals to racism and fantasy are speaking on behalf of the government. *See* Evanson Decl., Exs. I, H; *compare Walker*, 135 S. Ct. at 2251 (as government IDs, reasonable observers equate Texas license plates to government speech), *with Miller*, 622 F.3d at 537 ("[N]o one can reasonably interpret a private group's rally or press conference as reflecting the government's views simply because it occurs on public property.").

---

[5] The AOC further concedes that the Competition has no authorizing legislation, undercutting its claim that the Competition was "created by Congress" in order to "convey a message of support to young artists." Opp'n at 14. To the contrary, the Competition was created by Speaker O'Neill in 1981 and has been carried on as a voluntary tradition among individual members of Congress. Individual members are not "Congress." *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole.").

13

##### 2.   The Government Does Not Maintain Editorial Control Over the Works in the Competition.

Though the AOC has been delegated the authority by the HOBC to review all submissions for suitability in advance of hanging, there is no evidence that the AOC has ever actually asserted editorial control over Competition submissions.  It is undisputed that the art is selected at the outset by individual Members of Congress through a process of their choosing, and in its declarations to this Court, Defendant concedes that the AOC does not actually use the Suitability Guidelines to determine what works are suitable for the display in the Competition at all.  Rather, the current Competition Curator, Michele Cohen, attests that the AOC's review panel uses the Suitability Guidelines only to inform Members of Congress when their sponsored works are arguably not suitable, not to exclude them from the Competition.  Former curator Barbara Wolanin likewise attests that due to the growth of the Competition, reviewing the submissions at all is "a daunting challenge" and suggests that because it is "very difficult" to review so many submissions, the AOC has in fact abdicated its authority under the guidelines to determine whether unsuitable works should be "omitted from the Exhibit."  Clay Decl., Ex. E-2.

Far from evidencing AOC "editorial control," the Cohen and Wolanin declarations confirm that individual Members of Congress are given free rein to make individual suitability determinations as to their own sponsored works, and that it is the AOC's practice to defer to the Members' individual decisions.  Cohen Decl., Ex. 1 at 2; Cohen Decl., ¶¶ 11, 14.  This year, the only pieces flagged by the AOC's panel for "problematic subjects" were submitted by Representatives Amash and Serrano; one because it depicted "open wounds reminiscent of bullet holes" in a young African American boy's back, and the other because it depicted "drug use." Cohen Decl., Ex. 1, at 2.  Yet both works were permitted to remain in the Competition after the AOC's panel checked "with the offices to make sure their Member has seen the picture and

*wants it to represent the district*." *Id.* (emphasis added).  Where determinations on suitability have always been left in the hands of a large and diffuse group of individual Members, a single incidence of retroactive disqualification (over the sponsoring Member's objection) is not evidence of the AOC "maintaining editorial control."

Moreover, although the AOC argues that the required sponsorship by an individual Member is further evidence of "editorial control" indicative of government speech, the AOC fails to explain how suitability determinations made by individual Members, which that in practice override the AOC's own preliminary suitability determinations, constitute government control over the Competition's "message."  In making this claim, the AOC also ignores entirely that "Untitled #1" was, and continues to be, sponsored by Representative Clay, who, had he been given the same opportunity as Representatives Amash and Serrano, would have adamantly demanded that the painting continue to represent his district.

Finally, *Summum* and *Walker* do not help the AOC show editorial control sufficient to constitute government speech.  In *Summum*, the City historically practiced "selectivity" in accepting works and retained "final approval authority" over the selection of the permanent monuments placed in the Park.  Here, the AOC concedes that it retains final approval authority on paper only, while in practice, the AOC has ceded its final approval authority to the individual sponsoring Members of Congress.  Cohen Decl. ¶¶ 9-11; Wolanin Decl. ¶¶ 7-8.  Moreover, the *Summum* court found persuasive the fact that there was no "claim that the City ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors."  *Summum*, 555 U.S. at 472-73.  Here, the AOC has undisputedly opened the Competition to whatever art is sponsored.  It concedes that it has only ever rejected art that a

15

Member agrees is not suitable, and that it has never rejected a work that remains sponsored by a Member.  Cohen Decl. ¶¶ 9-11; Wolanin Decl. ¶¶ 7-8.

*Walker* is likewise inapposite.  There, the Court concluded that Texas retained "sole control over the design, typeface, color and … pattern for all license plates."  *Walker*, 135 S. Ct. at 2249 (quotation marks omitted); *see also Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561-62 (2005) (government speech where Secretary of Agriculture "exercises final approval authority over every word used in every promotional campaign" and officials participate in the open meetings at which advertising proposals are developed).  Here, in addition to suggesting that the AOC does not in fact apply the Suitability Guidelines at all, the AOC has both disclaimed any intent to censor and in fact relinquished editorial control to individual Members.

On this record, there is no evidence of intent, perception, or practice that supports a finding of government speech.

### 3.  The Competition Does Not Deliver a "Government-Controlled Message."

While recognizing that all of the expressive activity in the Competition is undertaken by private speakers, the AOC nonetheless argues that hosting the Competition amounts to receiving "assistance from private sources for the purpose of delivering a government-controlled message."  Opp'n at 17 (quotation marks omitted).  This argument fails.

First, the AOC has not identified a message the government intends to convey via the Competition, other than a general statement of "support for young artists."  Opp'n at 14.  Where, as here, the purpose of a government program is to "encourage a diversity of views" as opposed to transmit a "programmatic message," there is no government speech.  *Compare Velazquez*, 531 U.S. at 542-43 (no "message" where program funded free legal services and LSC-funded attorney spoke on the behalf of the client, not the government) *and Rosenberger*, 515 U.S. at 834 (funding to student newspaper groups was not "message" of University), *with DKT Int'l, Inc.*,

16

477 F.3d at 761 (program to eradicate HIV was government "message").  Even if the aspirational

"support for young artists" could be considered a "government-controlled message," the AOC

does not argue that "Untitled #1" is inconsistent with that message nor explain how its

retroactive disqualification from the Competition promotes that "message."  To the contrary,

common sense suggests that public degradation of a high school student's art by the Speaker of

the House and other Members of Congress undermines this "message" of "support for young

artists," belying the AOC's claim that the government actually intends to convey such a message.

Second, even if the Competition could be construed as communicating a unified

"message," which it cannot, it is not a message from "the government."  The AOC's declarations

make clear that, with the lone exception of Representative Clay, the AOC in practice cedes

suitability determinations to *individual* Representatives.  Cohen Decl. ¶¶ 9-11; Wolanin Decl.

¶¶ 7-8.  As this Court has recognized, "individual Members are not responsible for the actions of

the House as an institution, just as they cannot 'represent the interests of an entire House or all of

Congress.'"  *Rangel*, 20 F. Supp. 3d at 161(quoting *Kucinich v. Bush,* 236 F. Supp. 2d 1, 11

(D.D.C. 2002)).  As such, the art in the Competition is not "chosen by Congress" as the AOC

argues throughout its brief.  *See, e.g.*, Opp'n at 14-15.  Rather, it is undisputed that the works are

chosen by the individual Members of Congress, per the Competition's design, and that any

subsequent concern about the suitability of individual pieces is again left to the individual

Members.  Evanson Decl., Ex. A-4; Cohen Decl. ¶¶ 9-11; Wolanin Decl. ¶¶ 7-8.  In short,

"Congress" does not speak through the Competition.

Because the Competition does not advance a "government controlled message," the arts

patron cases cited in the AOC's brief are inapposite.  For instance, unlike here, the art exhibit

commissioned by the District of Columbia in *PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005), was

17

curated exclusively by the Selection Committee of the DC Commission on the Arts & Humanities.  The Selection Committee exercised complete control over the review and selection of the designs; receiving more than 1,000 entries, it rejected most.  *Id.* at 26.  Here, the AOC does not select the work at all, and while in theory it reserves a heretofore unemployed veto power, it has provided no evidence of *ever* having removed a work on "suitability" grounds over the objection of the sponsoring Member.[6]  Just this year, the *only* two works flagged by the AOC panel for potential content suitability problems were permitted to remain in the Competition on the grounds that their sponsoring Members wanted the works to be displayed.  Cohen Decl., Ex. 4 ("[W]e are very supportive of our winner . . . We will not be providing a substitute.").  This fact alone is sufficient to distinguish *Gittens*, where the Selection Committee was the only entity empowered to make esthetic judgments on behalf of the D.C. government and did not in practice defer to anyone else.  *Newton v. LePage*, 700 F.3d 595 (1st Cir. 2012), is likewise unhelpful. That case involved a government office relocating a mural that it had commissioned, which it owned, to another space.  Here, the AOC did not commission the works in question, does not maintain ownership over them, and played no role in their selection.

Finally, contrary to the AOC's analogy, the Competition is not like the National Gallery of Art, or any other government museum, where exhibit selections are made by a curator empowered to act on behalf of the institution in furtherance of a particular theme or message. *See* Opp'n at 21.  To the contrary, following this analogy, because the works are selected by the Members of Congress, the Competition has the equivalent of over 400 individual curators,

---

[6] The AOC's declaration references one instance in 1989 where a piece was removed because it was discovered to constitute a potential copyright violation.  Ayers Decl., Ex. 9.  There is no evidence however that the sponsoring Member objected to the removal.  The declaration provides no evidence of any other removal on content suitability grounds where the sponsoring Member did not agree.

unbounded by a single art selection process or theme, each with widely divergent views about what is "suitable" for display in the Capitol.  *See* Evanson Decl., Exs. H, I.  Despite their disparate interpretations of suitability and artistic merit, the AOC has throughout the Competition's history consistently deferred to their individual preferences.  Cohen Decl. ¶¶ 9-11; Wolanin Decl. ¶¶ 7-8.  This practice of deferring to 400 sponsors of 400 private speakers does not demonstrate advancement of a "government controlled message."  *See Gerlich*, 847 F.3d at 1015 (university trademarks not government speech where they were licensed to approximately 800 student organizations, including groups espousing opposite viewpoints).

In sum, the works in the Competition do not espouse any "government controlled message" beyond the preferences of the individual Members of Congress seeking to represent student artists from their own districts.  The Competition is not government speech.

### B.  The Retroactive Disqualification Of "Untitled #1" Was Impermissible Viewpoint Discrimination In A Limited Public Forum.

The AOC does not meaningfully respond to Plaintiffs' arguments that the Competition is a limited public forum or that the retroactive disqualification of "Untitled #1" was unlawful viewpoint discrimination and unreasonable in light of the purposes of the Competition.  As such, if the Court rejects the AOC's government speech defense (as it should), the AOC has conceded that Plaintiffs are entitled to relief.

Moreover, even absent the AOC's failure to respond, the facts offered by the AOC in its opposition present compelling evidence of viewpoint discrimination in a limited public forum.  As to the forum, the AOC itself explains that the intent of the Competition is to "provide[] an opportunity for Members of Congress to encourage and recognize the artistic talents of their young constituents," Opp'n at 3 (quoting Ayers Decl. ¶ 6), and that the determination of what works are displayed in the Cannon Tunnel is made by individual Members of Congress.  Cohen

Decl. ¶¶ 9-11; Wolanin Decl. ¶¶ 7-8.  By providing a space within the walls of the Capitol that is limited to use by Members that choose to participate in the Competition and the student artists that they sponsor, the Competition is thus a classic example of a limited public forum.  *See, e.g.*, *Summum*, 555 U.S. at 470 ("[A] government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." (citing *Perry Educ. Ass'n*, 460 U.S at 46 n.7)); *Cornelius*, 473 U.S. at 806 (limitations on speaker identity and/or subject matter are defining characteristics of a nonpublic forum).  As detailed above, the Competition displays every indicia of a program to "encourage a diversity of views from private speakers," *Rosenberger*, 515 U.S. at 834, as opposed to an effort to send a government-controlled message.  *Id.*; *see also Velazquez*, 531 U.S. at 542; *Gerlich*, 847 F.3d at 1015.  One need look no further than the Congressional Institute website to appreciate the multiplicity of subjects, media, and talents selected by individual Members and displayed in the Competition every year.  *See http://conginst.org/artcompetition/?compYear=2016&state=all*; *see also* Evanson Decl., Exs. H, I.  By contrast, the AOC has provided no contrary evidence of government speech to defeat the application of the forum analysis.

Because the Competition is a limited public forum, the "distinctions drawn" in controlling access to the forum must be "reasonable in light of the purpose served by the forum and . . . viewpoint neutral."  *Cornelius*, 473 U.S. at 470.  Here, however, the evidence of viewpoint discrimination is substantial.  The AOC admits that the removal of the Painting was precipitated by "negative media attention as well as criticism from several other Members of Congress."  Opp'n at 8.  Based on these negative reactions and media coverage declaring that the Painting espoused an "anti-law enforcement" view, the AOC engaged in his "re-review" of the Painting, which admittedly resulted in the first removal of any piece of art from the Capitol

20

Campus for political reasons.  Compl. ¶ 75; *see* Video recording: *Priorities of the House Officers & Leg. Branch Entities for FY18 and Beyond (Panel One): Hearing Before the H. Comm. On Admin.*, 115th Cong. (2017), https://www.youtube.com/watch?v=Mb8PwmNws0Q (colloquy between Representative Jamie Raskin and the AOC appears at 1:00:19-1:01:15).  Though the AOC's declarations seem untroubled by this dubious distinction—blithely declaring no other paintings were removed because no other complaints were received—government regulation of speech based on a listener's reaction is the definition of an unconstitutional "heckler's veto." *See, e.g.*, *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation. . . .  Speech cannot be . . . punished or banned, simply because it might offend a hostile mob."); *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015) (recognizing that a "heckler's veto is precisely that type of odious viewpoint discrimination" prohibited by the First Amendment); *Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (en banc) (First Amendment violation where removal of photograph exhibit at university was based on "handful of individuals' objections" to photo content); *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1110 (N.D. Fla. 2016) (government's "willfully blind deference" to a private permit holder in deciding whether plaintiff could pass out leaflets in a public park "implicates the same concerns that make courts loathe to uphold the heckler's veto, namely, the First Amendment protection against the government effectuating a complaining citizen's viewpoint discrimination") (internal quotation marks omitted).  In other words, it is the very fact that the complaints regarding the Painting resulted in its removal that demonstrates unlawful viewpoint discrimination.

Finally, perhaps to its credit, the AOC does not attempt to defend retaining two works for display that its panel determined were unsuitable, while excluding "Untitled #1," which the

reviewing panel had never previously flagged as problematic.  There simply is no defense.

Where pieces celebrating law enforcement have been displayed, along with numerous other

works touching on what arguably relate to contemporary political controversies and "problematic

subjects," there is no permissible explanation consistent with the First Amendment for the

retroactive disqualification of "Untitled #1."

### C.  The Suitability Guidelines Are Unconstitutionally Vague.

As Plaintiffs set forth fully in their opening brief, the Suitability Guidelines authorize

"arbitrary and discriminatory enforcement"—evidenced by the selective, retroactive

disqualification of "Untitled #1" challenged here—and are therefore unconstitutionally vague.

Pls.' Br. at 26 (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  In response, the

AOC first doubles back on its insistence that the Competition merely facilitates government

speech, such that Plaintiffs lack an expressive interest in the display of "Untitled #1" among the

Competition winners.  Opp'n at 22-23.  But as explained in Plaintiffs' opening brief and

reiterated above, the Competition is a limited public forum in which Plaintiffs do hold expressive

interests protected by the First Amendment, interests that the AOC has selectively trampled in

this case.  Then, eliding the core concern articulated in the relevant precedent regarding

unconstitutional vagueness, the AOC cites two inapposite cases and suggests that regardless of

what the Suitability Guidelines proscribe, they proscribe the subject matter depicted in "Untitled

#1."  Opp'n at 23.  This argument not only lacks merit, but, as explained below, is self-defeating.

Because the Suitability Guidelines arguably proscribe diverse subject matter of

indeterminate scope, they are void for vagueness.  *Hodge v. Talkin*, 799 F.3d 1145, 1173 (D.C.

Cir. 2015), *cert. denied*, 136 S. Ct. 2009 (2016) (explaining that terms commanding "wholly

subjective judgments . . . yield indeterminacy of a kind occasioning invalidation on vagueness

grounds") (internal quotation marks omitted).  The AOC thus misses the point in highlighting

22

Plaintiffs' "concession" that "Untitled #1" arguably depicts a subject of "contemporary political controversy." Opp'n at 23. As Plaintiffs identified in their opening brief, many other works on display in the Cannon Tunnel also arguably depict subjects of contemporary political controversy. Opp'n at 19. Yet those works continue to hang in the Cannon Tunnel, even the two identified by this year's AOC panel as depicting "problematic subjects." Cohen Decl., Ex. 1 at 2. It therefore remains entirely unclear which works meet the Suitability Guidelines and which do not. The AOC demonstrates this lack of clarity in countering Plaintiffs' point that racial strife in the context of policing dates far back in American history, asserting that "[i]ssues that have plagued this country for years can still be a contemporary problem." Opp'n at 24. Offering no guidance as to when such issues are "contemporary" and when they are not, he implicitly recognizes the unbounded nature of the term "contemporary" itself.[7]

The problem with regulations proscribing conduct or content in such indeterminate terms is that they authorize an "impermissible degree of enforcement discretion," allowing for "arbitrary and discriminatory enforcement." *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (internal quotation marks omitted); *see Smith v. Goguen*, 415 U.S. 566, 575 (1974) (concluding that the terms "treats contemptuously" were "sufficiently unbounded to prohibit . . . any public deviation form formal flag etiquette" and thus allowed "policemen, prosecutors, and juries to pursue their personal predilections" (internal quotation marks omitted)). The AOC's selective enforcement of the Suitability Guidelines against "Untitled #1" alone, *see* Opp'n at 19, reveals

---

[7] The Suitability Guidelines thus contrast with the regulation at issue in *United States v. Bronstein*, where the D.C. Circuit interpreted "harangue" and "oration"—two nouns describing public speeches—as sufficiently concrete "to give ordinary people fair notice of the conduct it punishes." No. 16-3003, — F.3d — 2017 WL 836091, at *3, *7 (D.C. Cir. Mar. 3, 2017). The court did not ultimately consider whether the terms invited arbitrary enforcement. *See id.* at *7.

the degree to which the Guidelines invite arbitrary and discriminatory enforcement.  Unlike in

*Griffin v. Secretary of Veterans Affairs*, therefore, here there is direct evidence of a "real . . .

threat to protected expression."  288 F.3d 1309, 1329 (Fed. Cir. 2002), *cited in* Opp'n at 23

(rejecting plaintiff's void for vagueness argument on the ground that he had merely "speculate[d]

that third parties, or even he himself, might be subject to criminal penalties for uttering the

wrong words on VA property").

In sum, because the AOC effectively concedes that the Suitability Guidelines contain

unbounded terms, and because this case demonstrates that those terms authorize arbitrary and

discriminatory enforcement, the Suitability Guidelines are unconstitutionally vague.

## III.    The Continued Deprivation of Plaintiffs' First Amendment Rights Constitutes Irreparable Harm.

The AOC does not dispute that "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury" where the injury is

threatened or occurring at the time of a plaintiff's motion for a preliminary injunction.  *Elrod v.

Burns*, 427 U.S. 347, 373 (1976).  Rather, the AOC claims only that the First Amendment does

not apply because the Competition is government speech.  As detailed above, this argument fails.

As such, the Court should treat as conceded Plaintiffs' showing of irreparable harm.

## IV.    The Balancing Of Equities Support Reinstating Untitled #1 In The Competition.

Both of the equitable factors—the public interest and the possibility of harm to Defendant

or others—support entering an injunction to reinstate the Painting in the Competition and

display.  As explained in Plaintiffs' opening brief, the public interest favors safeguarding First

Amendment principles.  *R.J. Reynolds Tobacco Co. v. U.S. FDA*, 823 F. Supp. 2d 36, 52 (D.D.C.

2011) ("'[T]he public clearly has an interest in free speech,' and therefore 'the public interest . . .

will be served by ensuring that plaintiffs' First Amendment rights are not infringed[.]'" (quoting

*Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 406 (D.D.C.1992))).  Indeed, the AOC raises no meaningful argument to the contrary.

Attempting to sidestep the issue before the Court, the AOC complains that granting a preliminary injunction will erode the government's discretion in deciding "what kind of art" can be displayed "on the walls of its buildings."  Opp'n at 25.  But as explained above, the "government" historically has not made any determinations about what is displayed in the Competition; rather, individual Members of Congress have sponsored works by individual artists.  Moreover, where the government has retained control of its space and seeks to express a government-sponsored message, nothing in the Plaintiffs' requested injunction would hinder that effort.  Plaintiffs seek only to participate fully as equals in the limited public forum created in the Competition, not to interfere with lawful government expression.

Finally, there is no evidence of government or public "harm" resulting from the Painting's display.  Without controversy, Untitled #1 was displayed in the Capitol Tunnel for seven months before Defendant kowtowed to criticism from a handful of vocal Members concerned with their perceived view of the Painting's message.  The very fact that "Untitled #1" was displayed for so long belies Defendant's claim that re-displaying Untitled #1 will harm the government.  Instead, the public interest will be served if Plaintiffs' constitutional rights are vindicated by re-displaying "Untitled #1."

For these reasons, equity favors granting Plaintiffs' motion for preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

Dated:  March 10, 2017

Respectfully submitted,

Leah J. Tulin
(DC Bar No. 988003)
Caroline M. DeCell
(DC Bar No. 1015491)
Tassity S. Johnson*
Satenik Harutyunyan*
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000
ltulin@jenner.com


Erwin Chemerinsky
(DC Bar No. 289330)
401 East Peltason Drive
Educ 1095
Irvine, CA 92697-8000
(949) 824-7722
echemerinsky@law.uci.edu

/s/ Kymberly K. Evanson
Kymberly K. Evanson
Athan P. Papailiou
Pacifica Law Group
1191 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 245-1700
kymberly.evanson@pacificalawgroup.com

Laurence H. Tribe**
420 Hauser Hall
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-1767
tribe@law.harvard.edu

James M. Williams**
Chehardy Sherman Williams
One Galleria Blvd., Suite 1100
Metairie, LA 70001
(504) 962-4287
jmw@chehardy.com


**Admitted *pro hac vice*


*Not admitted in D.C.; supervised by
principals of the Firm*

*Counsel for Plaintiffs*

26