DAVID PULPHUS et al.,

Plaintiffs,

v.

STEPHEN T. AYERS, in his official
capacity as Architect of the Capitol,

Defendant.

Civil Action No. 17-310 (JDB)

## <u>MEMORANDUM OPINION</u>

Before the Court is [7] plaintiffs' motion for a preliminary injunction. The plaintiffs in this case are David Pulphus, a student artist from Missouri's First Congressional District, and William Clay, the congressional representative for that district. Pulphus's painting was selected to represent the district in the 2016 Congressional Art Competition, and was hung in the Cannon Tunnel, part of the U.S. Capitol complex, in June 2016 with the other winning artwork. The painting was removed several months later by defendant Stephen Ayers, the Architect of the Capitol (who oversees the competition), for failing to meet the competition's content suitability guidelines. The artwork was removed after several complaints from, and unauthorized removals of the painting by, other members of Congress, who concluded that the painting was "anti-police." Pulphus and Clay claim that the removal of the painting constitutes viewpoint discrimination and violates their First Amendment rights; they seek a preliminary injunction to get the painting reinstalled in the Capitol. The painting is only eligible for display until May 1, 2017, when the 2016 exhibit ends.

There is little doubt that the removal of the painting was based on its viewpoint. But for the reasons that follow, plaintiffs' motion for a preliminary injunction will be denied. Although the Court is sympathetic to plaintiffs given the treatment afforded Pulphus's art, under controlling authority this case involves government speech, and hence plaintiffs have no First Amendment rights at stake.

## I. BACKGROUND

### A. THE CONGRESSIONAL ART COMPETITION

The Congressional Art Competition has been an annual event since its inception in 1982; its purpose is to promote and encourage young artists and national creativity. See Congressional Research Service, The Congressional Arts Caucus & the Congressional Art Competition: History & Practice (2016) [hereinafter "CRS Report"] [ECF No. 7-16] at A-4. Every year, participating congressional districts host competitions for high school students and select a winner to represent the district. Id. at A-4, A-6. Members of Congress are free to establish their own methods for judging submissions and selecting a winner, but all submitted art must conform to particular "Suitability Guidelines" promulgated by the House Office Building Commission (HOBC), which is composed of the Speaker and the majority and minority leaders of the House. Id. at A-4 & n.5, A-6; Decl. of William Clay [ECF No. 7-5] ¶ 5; see also 2016 Rules & Regulations (for Students & Teachers) [ECF No. 7-17] at B-2. The winning art must be sponsored by the House member representing the district, who must sign a form indicating that he or she approves of the artwork's content and wishes it to represent the district. Decl. of Stephen T. Ayers [ECF No. 11-1] ¶ 12; Student Information & Release Form [ECF No. 7-19] at D-2; see also Mot. for Prelim. Inj. [ECF No. 7-1] at 5. The winning art from each district is then displayed in the Cannon Tunnel, which

is part of the Capitol Grounds and connects the Capitol Building to the Cannon House Office Building.  Ayers Decl. ¶ 6.

The competition is governed by rules promulgated by the HOBC.  See generally 2016 Rules & Regulations.  The suitability guidelines that regulate the content of the displayed artwork prohibit works "depicting subjects of contemporary political controversy" or those of a "sensationalistic or gruesome nature."  Id. at B-2.  All artwork must be reviewed by a panel of experts chaired by the Architect of the Capitol (AOC) before it may be displayed; artists sign a form acknowledging that the AOC panel has final say regarding suitability.  Id.; see also Student Information & Release Form, at D-2.  In the past, when questions have arisen about a work's suitability, the AOC's office has reached out to the sponsoring member to confirm that the member still wishes to sponsor the work.  The practice has been to defer to the member if the member states that he or she continues to support the artwork.  Ayers Decl. ¶¶ 15–16; Decl. of Michele Cohen [ECF No. 11-2] ¶ 11; Decl. of Barbara Wolanin [ECF No. 11-3] ¶ 5.  The government has identified only one other occasion, prior to this case, when a piece of art was removed after it was put on display as part of the competition; the work appeared to be a copy of a photograph that had appeared that year in Vogue magazine.  See Ayers Decl. ¶ 16, Ex. 9.  In two other identified instances prior to this year's competition, when suitability questions arose and the AOC reached out to the sponsoring member, the member agreed to submit another piece.  Wolanin Decl. ¶¶ 7–8.

### B.  THE 2016 COMPETITION & "UNTITLED #1"

In April 2016, plaintiff Clay convened a panel of local artists to judge submissions in Missouri's First Congressional District for the 2016 Congressional Art Competition.  Clay adopted the panel's unanimous recommendation and selected plaintiff Pulphus's painting, "Untitled #1,"

to represent the district.  Clay Decl. ¶¶ 5, 7.  The painting depicts a protest in which two police officers, with guns drawn, face a young man as a crowd of protesters looks on in the background. Both the officers and the young man have "animalistic" features: the officers have the heads of pigs or warthogs, and the young man has the head of a wolf and a long tail.  See Mot. for Prelim. Inj. at 6; see also Decl. of David Pulphus, Ex. A [ECF No. 7-4] (photograph of Untitled #1). Depicted to the right is a police officer with human features leading a protester away; above them hovers "a young black man, crucified on the scales of justice."  Mot. for Prelim. Inj. at 6.  The protesters hold signs stating "Racism Kills," "Stop Killing," and "History."  A black bird and a white bird fly above the protesters on the left; behind the crowd stands the Gateway Arch.  The Arch appears to fade into metal bars on the right, from behind which another young man watches the protest.  See Pulphus Decl., Ex. A.  On the student release form, Pulphus described the painting as "[d]eep expressions on difficult times in our community."  Student Information & Release Form at D-2.  The press release Clay's office issued announcing Pulphus's win stated that Untitled #1 "portrays a colorful landscape of symbolic characters representing social injustice, the tragic events in Ferguson, Missouri and the lingering elements of inequality in modern American society."  Press Release [ECF No. 7-20].  Ferguson is in Clay's district.

A member of Clay's staff flew the painting from St. Louis to Washington, D.C., and on May 26, 2016, "art intake day," the painting was delivered to a reserved room in the Cannon House Office Building, where the winning art from each district was being collected for review prior to being put on display in the Cannon Tunnel.  Decl. of Dr. Thomas Ringenberg [ECF No. 7-42] ¶¶ 4–5; Clay Decl. ¶ 10.  There appears to be a small dispute about whether AOC staff were present at art intake day, or whether those collecting and reviewing the paintings were solely staff from congressional offices and the Congressional Institute.  Compare Ringenberg Decl. ¶ 4 with Cohen

4

Decl. ¶ 4.  In any event, a question was raised at this time about Untitled #1's size; the painting was measured, determined to be the appropriate size, and the painting was officially accepted to represent Clay's district.  Ringenberg Decl. ¶¶ 5–6; Clay Decl. ¶ 11.

On June 2, 2016, the panel convened by the AOC to review the 2016 submissions conducted an inventory of all the art collected in the art intake room, and pulled aside any work that appeared to exceed the sizing guidelines—some 25 pieces, including, once again, Untitled #1.  See Cohen Decl. ¶ 5, Ex. 1.  Untitled #1 was identified as having an oversized frame, and the painting was returned to Clay's office in order for adjustments to be made.  Id. ¶¶ 5, 8, Ex. 1.  The painting was not reviewed for content suitability at this time, but the other works that had not been set aside for sizing issues were assessed for suitability.  Id. ¶¶ 7, 9.  There are other paintings displayed from this year's competition (and that were displayed in past competitions) that arguably depict subjects of "contemporary political controversy," including racism and racial injustice related to policing.  See, e.g., Photographs of 2016 Winning Artwork [ECF No. 7-23] at H-1, H-2, H-5–H-7, H-10; Photographs of Past Years' Winning Artwork [ECF No. 7-24] at I-2, I-5, I-9, I-10, I-15, I-19, I-21, I-25.  There are also other paintings on display, and again, that were displayed in past competitions, that are arguably "gruesome," depict or suggest violence, or are otherwise visually disturbing.  See, e.g., Photographs of 2016 Winning Artwork at H-2, H-13, H-14; Photographs of Past Years' Winning Artwork, at I-7, I-13, I-17.  However, from this year's competition, the panel identified only two works that raised suitability concerns, one titled "Recollection," which depicts a young man with apparent bullet holes in his back, and the other depicting marijuana use by Bob Marley.  Cohen Decl. ¶ 9; see also Photographs of 2016 Winning Artwork at H-13 (photograph of "Recollection").  Consistent with its usual practice, AOC staff contacted the sponsoring members' offices regarding these works, and the members indicated they

supported the works' display.  Cohen Decl. ¶ 9, Exs. 2–5.  Both of these works were displayed. Id. ¶ 10.

After the panel pulled Pulphus's painting aside for framing issues, AOC staff apparently did not see it again until June 9, 2017, the last day the competition art was scheduled to be hung in the Cannon Tunnel.  Id. ¶ 12.  Clay's staff delivered the painting, without the problematic frame, directly to the Tunnel, where AOC staff determined that it was now the appropriate size and displayed it with the other works; no suitability determination was made at this time.  Id. ¶¶ 12– 13; Ayers Decl. ¶ 23; Def.'s Opp'n at 7.  The painting was hung in the space specifically designated for Missouri's First Congressional District and displayed with a label bearing Pulphus's name, the title and medium of the work, as well as Clay's name.  Clay Decl. ¶ 13; Compl. [ECF No. 1] ¶ 41. The painting hung without incident from June 9 until the end of December 2016, when the painting began to attract controversy.

On December 29, an article appeared online criticizing the painting as "depicting police officers as pigs with guns terrorizing a black neighborhood."  See Jason Howerton, Painting of Cops as Pigs Hung Proudly in US Capitol, Independent Journal Review (Dec. 2016) [ECF No. 7- 27] at L-1.  The article purportedly quotes House Representative Dave Reichert describing the painting as an "offensive and inaccurate caricature[]."  Id. at L-5.  The article also purportedly quotes a "senior Republican congressional aide" calling the painting "reprehensible," "disgusting," and stating that "this hate masquerading as art needs to be taken down now."  Id.  The next day, a talk show host urged viewers to call their congressmen to "get that picture down."  See Justin Baragona, What?! Congressman Hangs Painting in US Capitol Depicting Cops as Animals, Mediate (Dec. 30, 2016) [ECF No. 26] at K-2; Mot. for Prelim. Inj. at 8.  A week later, the presidents of police unions in New York, Los Angeles, San Francisco, San Jose, and Oakland sent

a letter to Speaker Ryan asking him to "immediately remove the reprehensible and repugnant 'art.'" Compl. ¶ 47; see also Mike Debonis, Cops didn't like a student painting hanging in the U.S. Capitol. So a congressman took it down., The Washington Post (Jan. 6, 2017) [ECF No. 7-28] at M-1–M-2.

Representative Duncan Hunter unilaterally removed the painting on January 6, 2017, and returned it to Clay's office with a handwritten note complaining that the painting did not comply with the suitability guidelines. Clay Decl. ¶¶ 16–17; see also Note from Rep. Reichert to Rep. Clay [ECF No. 7-10] at E-1. The AOC confirmed to Clay that the painting had been removed without AOC authorization, and Clay rehung the painting, apparently with the AOC's blessing and assistance. Clay Decl. ¶¶ 19–20; Ayers Decl. ¶¶ 18–19. The painting was removed without authorization twice more by other members of Congress; Clay rehung it each time. Clay Decl. ¶¶ 20–21; Ayers Decl. ¶¶ 18–19. Eventually, Representative Reichert sent a formal letter to the AOC asking that the painting be reviewed for suitability, arguing that the painting did not meet the content guidelines. Clay Decl. ¶ 22; Letter from Rep. Reichert to Mr. Ayers (Jan. 11, 2017) [ECF No. 7-31].

In response to Reichert's request, the AOC "informally conferred" with experts in the AOC office and outside industry experts, who agreed that the painting did not conform to the suitability guidelines. Def.'s Opp'n at 8; Ayers Decl. ¶¶ 22–24. The AOC therefore authorized the removal of the painting. Ayers Decl. ¶ 23. The AOC's letter to Clay notifying him of the removal decision does not explain on what basis the painting was found to be unsuitable—i.e., whether the painting was problematic because it depicted a contemporary political controversy, was sensationalistic, or was gruesome. See Letter Authorizing Removal [ECF No. 7-13]; see also 2016 Rules & Regulations at B-2. Ayers did not compare Untitled #1 to any other paintings displayed as part of

the competition—including the two about which the AOC panel had actually raised suitability concerns—because he received no complaints about any of the other paintings. Ayers Decl. ¶ 26. Clay appealed the painting's removal to the HOBC, which by statute has general supervisory authority over the AOC, see 2 U.S.C. § 2001, but the HOBC voted to uphold the painting's removal. Ayers Decl. ¶ 28. Clay and Pulphus filed this lawsuit shortly thereafter, claiming that the removal of Untitled #1 constitutes viewpoint discrimination in violation of their First Amendment rights.

## II. DISCUSSION

Plaintiffs argue that the government has created a limited public forum in the form of the Congressional Art Competition, in which case the government's regulation of content must be reasonable and viewpoint neutral. Defendants argue both that plaintiffs have no standing, and that the art competition is government speech rather than a limited public forum, in which case the government is free to discriminate based on viewpoint because plaintiffs have no First Amendment rights at issue. The Court will address each argument in turn.

### A. STANDING

A plaintiff "bears the burden of showing that he has standing for each type of relief sought." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). The "irreducible constitutional minimum of standing" consists of three elements that the plaintiff must demonstrate: (1) an injury in fact, (2) "fairly traceable" to the defendant's conduct, and that is (3) likely to be redressed by the relief sought. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (alterations and internal quotation marks omitted). Where, as here, a plaintiff seeks a preliminary injunction, "the plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion

for summary judgment.'"  Food & Water Watch, Inc. v. Vilsack, 79 F. Supp. 3d 174, 186 (D.D.C. 2015) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 907 n.8 (1990)).

The government does not dispute that Pulphus, at least, has alleged a concrete injury: he alleges that the government engaged in viewpoint discrimination in violation of his First Amendment rights, by removing his painting from display in the Congressional Art Competition because the painting was viewed as being "anti-police."  See, e.g., Police Dep't v. Mosley, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that [the] government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). But the government argues—briefly, and without much concrete discussion—that neither Pulphus nor Clay have standing because their injury is not "fairly traceable" to the named defendant, i.e., the AOC.  According to the government's theory, because Clay "appealed" the AOC's decision to remove the painting to the HOBC, the cause of plaintiffs' injuries was the HOBC's action, not the AOC's.  Def.'s Opp'n at 11.

The government relies on 2 U.S.C. § 2001, which provides:

> The House of Representatives Office Building . . . shall be under the control and supervision of the Architect of the Capitol, subject to the approval and direction of a commission consisting of the Speaker of the House of Representatives and two Representatives in congress, to be appointed by the Speaker [the HOBC].

The government offers no explanation or argument about what the HOBC's supervisory authority entails in the context of the art competition.  But whatever supervisory authority the HOBC has over the AOC or over the art competition, the HOBC has clearly delegated decision-making authority regarding compliance with the suitability guidelines exclusively to the AOC panel.  The guidelines plainly state that "the final decision regarding the suitability of all artwork for the 2016 Congressional Art Competition . . . will be made by a panel of qualified persons chaired by the Architect of the Capitol."  2016 Rules & Regulations at B-2.  The government has identified no

statute, regulation, rule, or past practice that provides for an appeal of the AOC's decision on suitability to the HOBC—or anyone else—or that requires the HOBC to approve the AOC's suitability determinations. Clay's "appeal" to the HOBC appears to have been entirely outside established channels, and the government has offered no support for its argument that Clay's actions somehow nullify the responsibility of the AOC, which by rule is in charge of all suitability determinations, and which ordered the removal of Pulphus's painting. Nor has the government argued that the AOC would lack the power to rehang the painting if ordered to do so by the Court. Pulphus's claimed injury—the unconstitutional removal of his painting by the AOC—is fairly traceable to the AOC's actions. The Court is likewise satisfied that the redressability requirement has been fulfilled, because the government does not dispute that the AOC would have the power to rehang the painting.

The government also argues that Clay lacks standing under <u>Raines v. Byrd</u>, 521 U.S. 811, 820 (1997), because Clay's claimed injury results from official actions he took on behalf of his constituents—serving as the sponsoring House member of Pulphus's painting in the art competition—rather than from actions taken as a private citizen. Def.'s Opp'n at 11. Because Pulphus has standing on the First Amendment claims, the Court need not consider whether Clay also has standing. <u>See</u> <u>Carpenters Indus. Council v. Zinke</u>, No. 15-5304, 2017 WL 1323530, at *7 (D.C. Cir. Apr. 11, 2017); <u>Mountain States Legal Found. v. Glickman</u>, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

## B. PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (per curiam) (internal quotation marks and emphasis

omitted).  A plaintiff seeking a preliminary injunction must establish: (1) that he or she is likely to suffer irreparable harm in the absence of injunctive relief; (2) a likelihood of success on the merits; (3) that the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest.[1]  See, e.g., Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  These latter two factors "merge when the Government is the opposing party."  Nken v. Holder, 556 U.S. 418, 435 (2009).  "In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis."  Pursuing America's Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted).  Accordingly, the Court will address this factor first.

1. Likelihood of success on the merits

Typically, when private speech takes place on public property, the appropriate First Amendment analytic framework is "forum analysis," which "determine[s] when a governmental entity, in regulating property in its charge, may place limitations on speech."  Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 (2010).  This analysis stems from the principle that "Government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated."  United States v. Grace, 461 U.S. 171, 178 (1983) (internal quotations marks omitted).

Some public property is dedicated by tradition to expressive activity; these traditional public forums include, for example, streets, sidewalks, and public parks, which "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and

---

[1] There is an ongoing debate as to whether courts may still use a "sliding scale" approach in analyzing these four factors, where a strong showing on one factor may compensate for a weaker showing on another.  The D.C. Circuit has suggested without deciding that this approach is called into question by the Supreme Court's decision in Winter v. Natural Res. Def. Council, 555 U.S. 7 (2008).  See Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011); see also id. at 393 (noting, "we read Winter at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" (internal quotation marks omitted)).  Under either approach, however, here plaintiffs' motion for a preliminary injunction must be denied.

discussing public questions." <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45

(1983). Because the government "must respect the open character of a public forum," its ability

to restrict expressive activity in such an area is very limited. <u>Oberwetter v. Hilliard</u>, 639 F.3d 545,

551 (D.C. Cir. 2011); <u>see also</u> <u>Grace</u>, 461 U.S. at 177. Public forums may also be created by

designation, when the government intentionally opens up public property for use as a public forum,

even though the property has not traditionally been treated as such. <u>Pleasant Grove City v.</u>

<u>Summum</u>, 555 U.S. 460, 469 (2009). These "designated public forums" are entitled to the same

protection as a traditional public forum. <u>Id.</u> In contrast, public property that "is not by tradition

or designation a forum for public communication," is known as a non-public or limited public

forum,[2] and in these forums, the government has a much freer hand to restrict expressive activity.

Restrictions on speech in non-public forums need only be "reasonable," but they must still be

viewpoint neutral—the government cannot engage in viewpoint discrimination, which the

plaintiffs argue has taken place here. <u>See, e.g.</u>, <u>Hodge v. Talkin</u>, 799 F.3d 1145, 1157–58 (D.C.

Cir. 2015). In other words, the government in a limited or non-public forum could prohibit, for

example, artwork depicting police (assuming it has a reasonable rationale for doing so), but it could

---

[2] Some circuits recognize four forums instead of three: public forums, designated public forums (analyzed as public forums), limited public forums (analyzed the same way as non-public forums), and non-public forums. <u>See, e.g.</u>, <u>Hopper v. City of Pasco</u>, 241 F.3d 1067, 1074 (9th Cir. 2001). The Supreme Court has been imprecise with its language in the past, and seems to use the term non-public forum and limited public forum interchangeably; hence the confusion as to whether there are four forums or three. <u>See, e.g.</u>, <u>Am. Freedom Defense Initiative v. King Cty.</u>, 136 S. Ct. 1022, 1022 (2016) (Thomas, J., dissenting from denial of certiorari) ("[If] the government creates a limited public forum (also called a nonpublic forum)—namely, a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects—then speech restrictions need only be reasonable and viewpoint neutral." (internal quotation marks omitted)); <u>Christian Legal Soc'y</u>, 561 U.S. at 679 n.11 (noting that, in a limited public forum, "a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral" (internal quotation marks omitted)); <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 687 (1992) (O'Connor, J., concurring) ("[R]estrictions on speech in nonpublic fora are valid if they are reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (internal quotation marks omitted)). Plaintiffs argue that the art competition is a limited public forum, or in the alternative a non-public forum. In reality, this distinction does not much matter, as those two forums, if a circuit distinguishes between them, are analyzed the same way. The D.C. Circuit appears to be a three-forum circuit—but it too is somewhat imprecise with its language, although non-public forum appears to be the preferred term.

not prohibit works that are "anti-police" while allowing works that are "pro-police." That would be viewpoint discrimination.

Here, plaintiffs do not argue that either the Cannon Tunnel or the art competition is a public forum or designated public forum, in which First Amendment protections are at their broadest. Instead, this case hinges on whether the art competition is a limited/non-public forum, or whether the art competition instead constitutes government speech. Plaintiffs contend that the government engaged in viewpoint discrimination when it removed Pulphus's painting from display, which, if the competition is a limited or non-public forum, would likely violate plaintiffs' First Amendment rights. But if the art competition is government speech, then plaintiffs have no First Amendment rights at stake and forum analysis does not apply; therefore, it does not matter if the government engaged in viewpoint discrimination. See, e.g., Walker v. Sons of Confederate Veterans, 135 S. Ct. 2239, 2245 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); People for the Ethical Treatment of Animals v. Gittens, 414 F.3d 23, 30 (D.C. Cir. 2005) (noting that when the government is acting as an arts patron, it is "free to communicate some viewpoints while disfavoring others").

The government speech doctrine is still evolving, and it is not entirely clear how courts should distinguish between non-public forums and government speech. See, e.g., Summum, 555 U.S. at 470 ("There may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech."). Walker and Summum discuss three factors relevant to identifying government speech: (1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker; and (3) whether the government maintains

editorial control over the speech.  See Walker, 135 S. Ct. at 2247–49; Summum, 555 U.S. at 470–72.

a. Traditional use of the medium

Courts have recognized that "[a] medium that has long communicated government messages is more likely to be government speech."  Mech v. School Bd. of Palm Beach Cty., 806 F.3d 1070, 1075–76 (11th Cir. 2015).  But "a long historical pedigree is not a prerequisite for government speech."  Id.  This factor is therefore useful to consider but not ultimately dispositive of the government speech inquiry.

Plaintiffs argue that the government has not demonstrated that the art competition has traditionally been used as a medium for government speech.  Pls.' Reply [ECF No. 13] at 10–13. Focusing this inquiry at this level of specificity may be somewhat unhelpful, however, as it seems to beg the very question the Court is asked to confront in this case: whether the art competition is government speech.  As the art competition has been conducted roughly the same way since 1982, presumably, if the competition is government speech, then it has "traditionally" been used as a medium for that speech, and vice versa.  An inquiry at a higher level of generality may therefore be more useful: for example, whether the government has used art competitions generally to speak to the public, or whether Congress has traditionally used art displays in the Capitol to communicate to the public.  See, e.g., Summum, 555 U.S. at 470 (analyzing how governments have traditionally used monuments to speak to the public—not how the government has used monuments in that particular park); Freedom from Religion Foundation, Inc. v. Abbott, No. A-16-CA-00233-SS, 2016 WL 7388401, at *5 (W.D. Tex. Dec. 20, 2016) (analyzing whether "governments have used designs and displays in statehouses to speak to the public" (internal quotation mark omitted)).

The AOC maintains that governments have traditionally used art displays in public buildings to communicate to their citizens, and that "[a]rt and statues that permeate the Capitol campus are selectively chosen to convey a government message concerning this country's history." Def.'s Opp'n at 14. According to the government, the art competition is intended to convey a message of support for young artists; indeed, the competition's stated purpose, as the Court has already noted, is to "encourage nationwide artistic creativity by high-school students through art exhibits in the tunnels connecting the Capitol to the House Office Buildings." CRS Report at A-4. Thus, according to the government, the competition was set up specifically for the purpose of conveying a government message to the public, through the winning art selected and approved for display. Def.'s Opp'n at 14–15. It is through this selection process that "Congress decides how it desires to encourage such creative endeavors consistent with the appropriate level of decorum for the institution." Id. at 15.

Plaintiffs contend, however, that "support for art" is not specific enough to constitute a government "message." Mot. for Prelim. Inj. at 29–30. They point out that the art competition has no unifying "theme," unlike other public art displays that have been found to be government speech. Id. at 30; see also Gittens, 414 F.3d at 25–26 (finding government speech where D.C. solicited local artists and organizations to decorate statues of donkeys and elephants to show off the capital's "whimsical side" and "foster an atmosphere of amusement and enjoyment"). But certainly the federal government has traditionally acted as an arts patron, which does convey a kind of message about the government's support for art—or at least the art the government chooses to sponsor. See, e.g., United States v. Am. Library Ass'n, 539 U.S. 194, 204–05 (2003) (plurality opinion); Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 586 (1998); Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 674 (1998); Gittens, 414 F.3d at 30. Moreover, the

Supreme Court has not required that a medium convey a consistent or unified government message in order to constitute a "traditional" medium for government speech. See Walker, 135 S. Ct. at 2248 (noting the variety of messages conveyed by state specialty license plates); Summum, 555 U.S. at 470–71 (noting the same with respect to public monuments). Plaintiffs are correct, though, that the government has provided little specific evidence to support its argument that either the art competition, or art in the Capitol more generally, has been a traditional medium for government speech. This factor is therefore inconclusive.

b.    Whether the public reasonably interprets the government to be the speaker

Regarding this second factor, the Court must examine whether the public would reasonably interpret the government to be speaking through the art competition, or through the art displayed on the walls of the Cannon Tunnel. This factor weighs much more strongly in favor of the government than does the first. This case is not like those instances where the government simply makes funds or public property available to private organizations, but does not otherwise associate itself with the organization's activities. See., e.g., Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995); Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788 (1995). Here, the art competition clearly takes place under the aegis of Congress; it is titled "Congressional Art Competition." See, e.g., 2016 Rules & Regulations (identifying the competition as such); Student Information & Release Form (same). It is run by members of the House, congressional staffers, and agents of Congress (i.e., the AOC), and the art is chosen by members of the House to represent their congressional districts. The release form the artist signs states that the artist grants the House the right to display the art, and that the determination as to the suitability of the entry will be made by "a House panel chaired by the Architect of the Capitol." Student Information & Release Form at D-2.

The art is then displayed in the Cannon Tunnel by congressional district, and labeled with both the artist's and the sponsoring House member's name. Clay Decl. ¶ 13; Compl. ¶ 41. The Cannon Tunnel, furthermore, is an area that the public may only access if accompanied by a congressional staff member, or if they are in possession of a security pass issued by authorized congressional staff. See Ayers Decl. ¶ 6. In other words, the Tunnel is not an area of the Capitol Grounds to which the public has open access, and certainly not for general purposes of expressive activity, meaning that plaintiffs' passing argument that the Capitol Grounds are a "traditional public forum" has no merit in this context. See Pls.' Reply at 10–11 (citing Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989)).

It is therefore easy for the Court to believe that the public would reasonably associate the art competition, and the art displayed in the Tunnel as part of the competition, with the government—both the competition and the art display in the Cannon Tunnel self-identify as being sponsored by Congress. Art displayed on public property is often treated as being endorsed by the government or representative of the government's views, and is therefore considered government speech. See, e.g., Summum, 555 U.S. at 470–71 (monuments in public parks are seen as government expression, even when the monuments are privately donated); Mech, 806 F.3d at 1076–78 (banners hung on school fences reasonably seen as school endorsement of private sponsors identified on the banners); Newton v. Lepage, 700 F.3d 595, 602 (1st Cir. 2012) (mural hung in Maine Department of Labor waiting room "would easily lead viewers to understand that the government's location of the art was an endorsement of the mural's message").

Plaintiffs argue, however, that "[n]o reasonable viewer would infer that 400 high-school art students whose work covers subjects ranging from still life fruit and animals to racism and fantasy are speaking on behalf of the government." Pls.' Reply at 13. But courts have repeatedly

acknowledged in arts and art display cases that the message of any particular piece of art "[is] no more the government's speech than are the thoughts contained in the books of a city's library." Gittens, 414 F.3d at 28. Rather, it is the exercise of editorial discretion in the selection and presentation of the artwork that constitutes the government's expressive conduct; the government "does not necessarily endorse the specific meaning that any particular donor sees in the [donated work of art]." Summum, 555 U.S. at 474–77; see also Am. Library Ass'n, 539 U.S. at 204–05 (citing Forbes, 523 U.S. at 673, and Finley, 524 U.S. at 585–86) (discussing the government's editorial discretion); Gittens, 414 F.3d at 28 (same). While plaintiffs may be correct that viewers would not necessarily associate the "message" of any particular student's artwork with the government, it nonetheless seems likely that viewers would assume that art hung on the walls of the Capitol, associated with a congressional district, and labeled with the name of a member of Congress, was in fact selected by the government for display. In other words, viewers would reasonably assume that the government was exercising editorial choice—i.e., engaging in expressive conduct—in selecting the winners of the Congressional Art Competition and displaying the winning work in the Cannon Tunnel. The government, then, is understood by the public as speaking through that exercise of choosing which works are displayed in the art competition.

c. Editorial control

If the previous factor dealt with the degree to which the public perceives that the government exercises control over the content of the art displayed, this third factor deals with the degree of control the government actually exercises over the content of the works displayed. Each participating House member is responsible for selecting art to represent his or her district, subject to the suitability guidelines. Some members, like Clay, empanel committees of outside experts to make a recommendation regarding which piece of art should be chosen. See Clay Decl. ¶ 5. The

fact that private individuals play a role in helping to select winning art for display does not necessarily mean that the competition is not government speech, however. Rather, the key question is whether the government still "effectively control[s]" the message being conveyed through the competition, for example by maintaining "final approval authority" over the selection of the art displayed. Summum, 555 U.S. at 473 (internal quotation marks omitted); see also Gittens, 414 F.3d at 28. There is no dispute here that, according to the competition rules, the AOC retains the right to make final determinations regarding the content suitability of any work chosen. But plaintiffs' key argument is that the government created a de facto non-public forum because the AOC has never in practice exercised editorial control over the art displayed in the competition. Rather, plaintiffs maintain, the AOC has traditionally deferred to the judgment of the sponsoring members—until now.

The fact that the AOC has accepted most sponsored works does not necessarily mean that the government has failed to retain editorial control over the competition. Indeed, in cases in which the government displays privately created art, courts appear to have focused relatively little on how often the government actually exercises editorial control, rather than on the extent to which the government retains the right to exercise it. In Summum, for example, the Court noted that the city retained "final approval authority" over the monuments displayed in the park, but did not describe what that entailed—except to state that the city "decided to accept [private] donations and to display them in the Park." 555 U.S. at 472. At least eleven of the fifteen monuments in the park were privately donated, but there is no indication how many the city may have rejected. Id. at 464–65. In Gittens, the city was clearly much more selective in choosing which donkey and elephant designs to accept and which to reject for display, but again, the court did not seem to focus on how selective the city was in practice. 414 F.3d at 26. Instead, the court focused much

more broadly on the basic principle that the city was "engaged in speech activity" simply by deciding what art to display, and therefore the fact that the city appeared to follow its content guidelines with respect to some works but not others did not matter.  Id. at 28–30.  The court compared the exhibit to a government art museum or the selection of books in a public library, and noted that there could be "no persuasive argument that the First Amendment would prohibit the [city] from engaging in viewpoint discrimination" had it decided to place the donkey and elephant models in public buildings as opposed to public sidewalks and parks.  Id. at 29.

Plaintiffs attempt to distinguish Summum and Gittens by pointing out that the city in those cases retained ownership rights over the donated works, whereas here the government does not.  But neither court in those cases emphasized the fact of ownership, and here, while the government does not retain ownership of the art work, it does retain control of the works for the duration of the exhibit (up to two years)—artists sign a form to that effect.  See Student Information & Release Form at D-2.  Moreover, students are warned that they will not be able to retrieve their work until the exhibit has ended; they are specifically told not to submit a piece that they may need for other purposes.  See 2016 Student Rules & Regulations at B-1–B-2.  Hence, the government maintains physical control over the works for purposes and the duration of the competition.

Plaintiffs cite two cases in which the court rejected or did not consider a government speech theory in the context of art exhibits in public buildings.  They rely heavily on Freedom from Religion Foundation, Inc. v. Abbott, a case similar to this one involving art displays in the state capitol, which likewise had a requirement that the work be recommended for display by a member of the state legislature, the governor, or the lieutenant governor.  2016 WL 7388401, at *1–2.  Despite the sponsorship requirement, the court found that the display at issue did not constitute government speech, because the display included a disclaimer specifically stating that the display

was not endorsed by the state.  Id. at *5.  Accordingly, the court concluded that because the "exhibit expressly states it is privately funded and not endorsed by the government, reasonable citizens would not assume the exhibit 'convey[ed] some message on the [government's] behalf.'"  Id. (quoting Summum, 555 U.S. at 471) (alterations original).

Likewise, Hopper v. City of Pasco involved an art exhibit in city hall in which local artists were invited to display their work.  241 F.3d 1067, 1070–73 (9th Cir. 2001).  The city government outsourced the selection of art and management of the exhibit to a private organization, and there was only an informal agreement (via letter) between the city and the organization that the art should avoid "controversy."  Id. at 1070.  There was also no pre-screening process or formal selection process in place—artists simply volunteered and their works were always accepted for display.  Id. at 1070–71.  The Hopper court did not discuss government speech, but concluded that the city had created a designated public forum because the city had never before pre-screened works or exercised its asserted right to reject works submitted for display.  Id. at 1078.  According to plaintiffs, their case is more similar to Hopper and Abbott than it is to Summum and Gittens.

The Court disagrees.  Assuming Abbott and Hopper were correctly decided, they are inapposite.  In Abbott, the state expressly disclaimed any association with or endorsement of the artwork displayed—the disclaimer was added to the exhibit at the government's request.  And in Hopper, the city entirely turned over the art selection process to a private organization; it established no selection criteria or procedures, and had never previously exercised control over the art displayed.  Neither of those key facts is present here.

While it is certainly clear that the AOC has not exercised extensive control over the content of submitted works in the past, it has exercised some control.  The competition rules provide that all artwork must be reviewed before it is put on display, and some kind of content review takes

place every year, even if it is not always as thorough as the rules would seem to require. Paintings must be of a certain size and medium, and the rules encourage congressional staffers to contact the AOC Curator if House members have questions about the content suitability of the art they receive. See 2016 Rules & Regulations (for Congressional Offices) [ECF No. 7-7] at B-2–B-3. Consistent with competition rules, the AOC has in the past disqualified a work that raised copyright issues, and appears to have done so without consulting the sponsoring member. See Ayers Decl. ¶ 16, Ex. 9 (photograph removed because it appeared in Vogue). Likewise, the AOC has raised suitability questions about several submitted pieces over the years and reached out to sponsoring members to solicit their opinions on the piece; indeed, this happened twice this year. Moreover, twice in the past, the member agreed to exchange the work for something else, so we do not know what would have happened in those cases if the member had continued to support the art. The other times, the AOC deferred to the members' judgment. But even this decision to defer could be considered an exercise of editorial discretion: the AOC is not obligated to defer to members' judgments about suitability—it chooses to do so.

House members themselves play a significant role in the selection of the art displayed as part of the competition. Even where the House member uses a private panel to select the winning art, the competition in each district in still run under the auspices of that member's office as part of the larger Congressional Art Competition, and the member must ultimately sponsor the winning piece from that district. When the winning piece is displayed, it is labeled with the sponsoring member's name. This is not private activity, but rather activity carried out in a member's official capacity. Yet plaintiffs implicitly consider this to be private activity rather than an exercise of editorial control on the part of the government pursuant to the Congressional Art Competition, without really explaining why. They focus heavily on the fact that Clay continues to sponsor

Pulphus's painting, but do not address the fact that he is a government actor whose decision in this case has been overturned by another government actor with greater decision-making authority on this particular issue. The Court recognizes the oddity in this case that Clay is both a plaintiff and a part of the "government" that is speaking. But the competition rules set up a hierarchy of decision-making authority with respect to content suitability: House members, by whatever method of judging they choose, select one winning piece from among the multiple works submitted to represent the district, but their choice may be overruled by the AOC if it concludes that the work does not meet the suitability guidelines. In this case, Clay's decision was overruled by the entity at the top of this decision tree, making his objections irrelevant for purposes of the government speech analysis. If there is disagreement among members of the House as to what the suitability guidelines mean and how they should be interpreted, or who should have final decision-making authority as to suitability, that is an internal matter for the members to resolve amongst themselves, as has been done here. But the fact remains that it is the <u>government</u>, first through Clay in his official capacity and then most importantly here through the AOC, that decides in its discretion what art is displayed.

In any event, even discounting the editorial control that House members exercise in choosing and sponsoring the winning art from their district, the Court finds that the AOC retains editorial control over the art submitted in the competition. While the AOC may ultimately choose to keep a light hand on the reins, AOC staff is clearly involved every year in answering questions from member offices about suitability, reviewing (most) of the works submitted for compliance with the suitability guidelines, identifying those that raise concerns, and seeking input from the sponsoring member about the appropriate response. This is not a case in which the government has surrendered control of the exhibit to a private party, or has failed to ever exercise its authority.

*        *        *

The outcome in this case is controlled by the decisions of the Supreme Court in <u>Walker</u> and <u>Summum</u> and of the D.C. Circuit in <u>Gittens</u>. Applying the test from those cases, the Court finds that the art competition and the display in the Cannon Tunnel constitutes government speech. While the first <u>Walker</u>/<u>Summum</u> factor, whether the medium has traditionally been used as a forum for government speech, is inconclusive, the other two factors weigh in favor of a finding of government speech. The public is likely to assume that the art displayed as part of the "Congressional Art Competition"—in which the art must be sponsored by a member of the House, is displayed by district and labeled with the member's name, and is hung on the walls of a congressional building—has in fact been curated and selected for display by the government. In other words, the public is likely to assume that the government is the speaker. Moreover, the AOC retains sufficient editorial control over the artwork chosen for display. The government here has therefore engaged in speech activity by "using its editorial discretion in the selection and presentation of" the art submitted as part of the competition. <u>Gittens</u>, 414 F.3d at 28 (internal quotation marks omitted). The alternative conclusion is that the government has opened up the display to any work submitted as part of the competition, a conclusion that is simply not supported by the record.

Thus, because the speech activity here is likely government speech, plaintiffs have no First Amendment rights at issue. That being so, the Court must also reject plaintiffs' vagueness challenge to the suitability guidelines. Briefly, plaintiffs argue in the alternative that, if the government did not engage in viewpoint discrimination, the suitability guidelines are void for vagueness. Mot. for Prelim. Inj. at 26–28; <u>see also, e.g.</u>, <u>FCC v. Fox Television Stations, Inc.</u>, 132 S. Ct. 2307, 2317 (2012) ("When speech is involved, rigorous adherence to [the requirement of

24

clarity in regulations] is necessary to ensure that ambiguity does not chill protected speech."); Vill.

of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99 (1982) ("[P]erhaps

the most important factor affecting the clarity that the Constitution demands of a law is whether it

threatens to inhibit the exercise of constitutionally protected rights.").  But the argument that the

competition rules are void for vagueness because they may chill plaintiffs' protected speech

depends on plaintiffs having speech rights to chill, which the Court has already determined is not

the case.  When the government speaks, it is free to promulgate vague guidelines and apply them

arbitrarily.  See Gittens, 414 F.3d at 30 ("[A]s a patron of the arts, the government is free to

communicate some viewpoints while disfavoring others, even if it is engaging . . . in utter

arbitrariness in choosing which side to defend and which side to renounce.") (internal quotation

marks omitted).  This makes sense, as there are no civil or criminal penalties that may be imposed

on plaintiffs if they run afoul of the suitability guidelines here, because the government is acting

as an arts patron, not as law enforcement.  See Finley, 524 U.S. at 588–89 (noting that the content

standards for NEA grants are "undeniably opaque" but "when the Government is acting as patron

rather than as sovereign, the consequences of imprecision are not constitutionally severe").

Therefore, plaintiffs are unlikely to succeed on the merits of either of their First Amendment

claims.

     2.  Irreparable injury

Plaintiffs contend that they will suffer irreparable harm if a preliminary injunction is not

granted because their First Amendment rights are actively being impaired as long as the painting

remains excluded from the exhibit.  In addition, the painting is only eligible for display until May

1st of this year, when the 2016 exhibit ends.  Mot. for Prelim. Inj. at 13, 31; see also Notice to

Court [ECF No. 14] (notifying the Court when the exhibit ends).  Courts generally agree that the

loss of First Amendment rights constitutes irreparable harm. See, e.g., Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (noting that "loss of [First Amendment] freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury'" (quoting Elrod v. Burns, 427 U.S. 347, 373–74 (1976))). But again, this depends on plaintiffs having First Amendment rights at issue. As the Court has already noted, the likelihood of success on the merits factor is often dispositive in First Amendment cases, and here, the Court has concluded that plaintiffs are unlikely to succeed on the merits because the competition constitutes government speech. Plaintiffs have therefore suffered no loss of First Amendment rights and cannot demonstrate irreparable harm.

3. Balance of harms and the public interest

Likewise, the Court cannot conclude that a preliminary injunction in this case would serve the public interest. While "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation," Pursuing America's Greatness, 831 F.3d at 511, the government action here is likely constitutional. Thus, the public interest in protecting First Amendment rights would not be vindicated by granting a preliminary injunction. Moreover, granting a preliminary injunction would harm the government by interfering with its ability to control the content of its own speech. Because plaintiffs have not demonstrated that they will suffer an irreparable injury without an injunction or that an injunction is in the public interest, and because the government will suffer some harm if an injunction is granted, these factors weigh against plaintiffs and in favor of the government.

\*          \*          \*

Plaintiffs have not satisfied the requirements to obtain a preliminary injunction. They are unlikely to succeed on the merits because the art competition and display in the Cannon Tunnel

constitute government speech, and plaintiffs therefore have no First Amendment right to display the painting at issue. Accordingly, they also cannot demonstrate that they will suffer an irreparable injury in the absence of a preliminary injunction, or that the injunction is in the public interest in order to protect First Amendment rights. Because the balance of factors weighs against plaintiffs, the preliminary injunction will be denied.

## **CONCLUSION**

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. While at least Pulphus has standing to sue, plaintiffs have not satisfied the standard for the issuance of a preliminary injunction. A separate order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  April 14, 2017